[Nos. 41037-1-II; 41047-8-II.   Division Two.   June 26, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. JONATHAN N. RODEN, *Appellant*.

60

*Valerie Marushige*, for appellant.

*Susan I. Baur, Prosecuting Attorney*, and *Sean M. Brittain, Deputy*, for respondent.

¶1 PENOYAR, J. — A police detective acquired the iPhone[1] of a suspected drug dealer. The detective looked through the iPhone's contents and replied to a text message from Jonathan Roden stored on the iPhone. Through a series of text messages from the dealer's phone, the detective and Roden arranged to meet for a drug transaction, which led to Roden's conviction of attempted possession of heroin. He appeals this conviction, arguing that the detective violated Washington's privacy act, chapter 9.73 RCW, by intercepting his private text messages to the dealer. Because Roden impliedly consented to the recording and/or interception of the text messages that he sent to the dealer's iPhone, his argument fails.

¶2 Additionally, Roden appeals a conviction of possession of heroin arising from a separate incident. He argues that a police officer violated his Washington Constitution article I, section 7 and Fourth Amendment rights by conducting a warrantless search of a zippered bag in his vehicle. Because officer safety reasons justified the warrantless search, this argument also fails. Accordingly, we affirm both of Roden's convictions.

## FACTS

¶3 The State charged Roden in two separate cause numbers with attempted possession of heroin (superior court cause no. 09-1-01153-0) and with possession of heroin (superior court cause no. 10-1-00091-4). Roden stipulated that he committed both crimes. The trial court convicted him at a stipulated facts trial. Roden appeals.

---

[1] The iPhone is a "smartphone" with "computer-like capabilities" that enables users to browse the Internet, to send and receive e-mails and text messages, and to take photographs, among many other functions. *See, e.g., In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 374 (D.N.J. 2010).

## ANALYSIS

WASHINGTON'S PRIVACY ACT

¶4 Roden argues that the detective's interception of his text messages to a suspected drug dealer violated his rights under Washington's privacy act, chapter 9.73 RCW. He does not raise any constitutional claims with regard to the detective's actions. Because Roden impliedly consented to the recording of these text messages, this argument fails.

### A. The Search

¶5 On November 3, 2009, when Detective Kevin Sawyer arrived to begin his shift, several officers gave him an iPhone they had seized from Daniel Lee, who had been arrested earlier that day on drug charges.[2] Sawyer spent about 5 or 10 minutes "looking at some of the text messages" on the iPhone; he also looked to see "who had been calling." Report of Proceedings (RP) (Apr. 29, 2010) at 9. Many of the text messages that Lee's iPhone had received and stored were from individuals who were seeking drugs from Lee. A text message from an individual identified as "Z-Jon" read, "I've got a hundred and thirty for the one-sixty I owe you from last night." Clerk's Papers (CP) (41037-1-II) at 24; RP (Apr. 29, 2010) at 11. Posing as Lee, Sawyer sent Z-Jon a text message reply, asking him if he "needed more." RP (Apr. 29, 2010) at 11. Z-Jon responded:

> Yeah, that would be cool. I still gotta sum [sic], but I could use some more. I prefer to just get a ball,[3] so I'm only payin' one eighty for it, instead of two Ts for two hundred, that way . . . it would be easier for any to get up.

RP (Apr. 29, 2010) at 11.

---

[2] The basis of the officers' seizure of Lee's iPhone (e.g., warrant, search incident to arrest, booking/inventory search) is not clear from the record. Whether Lee's iPhone was lawfully seized is not at issue in this case.

[3] A "ball" is "a drug weight" equivalent to approximately 3.5 grams.

¶6 Eventually, through a series of text messages, Sawyer and Z-Jon agreed to meet at a local grocery store for a drug transaction. From the parking lot, Sawyer sent a text message to Z-Jon, asking him to identify his car. Z-Jon responded that he was in a maroon GMC truck. Sawyer observed the truck in the parking lot and arrested Roden.

¶7 Roden moved to suppress "[t]he fact that text messages were exchanged and the content of those messages." CP (41037-1-II) at 10. He asserted that Sawyer had violated RCW 9.73.030(1)(a), a provision of Washington's privacy act (Act), because he had "clearly intercepted a private communication [that] was transmitted by a telephone without first obtaining the consent of Mr. Roden[,] who was one of the participants in the communication." CP (41037-1-II) at 9.

¶8 At the suppression hearing, Sawyer testified consistent with the facts above. The trial court denied Roden's suppression motion. The trial court entered the following conclusions of law:

> 3. Under RCW 9.73, there is no reasonable expectation of privacy by a sender from different [sic] cell phone in a cell phone's inbox, just as there is no reasonable expectation of privacy in a text message found in a telephone call message left on an answering machine that could be overheard by anyone.

> 4. Washington's Privacy Act is broad; however, there was no violation in this instance. The Defendant's motion to suppress is denied.

CP (41037-1-II) at 25.

B. Roden Impliedly Consented to the Recording of the Text Messages

¶9 RCW 9.73.030(1)(a) states, in relevant part:

> [I]t shall be unlawful for any individual . . . or the state of Washington, its agencies, and political subdivisions to intercept, or record any . . . [p]rivate communication transmitted by telephone . . . between two or more individuals between points within or without the state by any device electronic or other-

wise designed to record and/or transmit said communication regardless how such device is powered or actuated, without first obtaining the consent of all the participants in the communication.

Any information obtained in violation of RCW 9.73-.030(1)(a) is generally inadmissible in a criminal case. *See* RCW 9.73.050.

¶10 We engage in a four-pronged analysis to determine whether an individual has violated the Act. *State v. Christensen*, 153 Wn.2d 186, 192, 102 P.3d 789 (2004). There must have been (1) a private communication transmitted by a device that was (2) intercepted by use of (3) a device designed to record and/or transmit, (4) without the consent of all parties to the private communication. *Christensen*, 153 Wn.2d at 192 (citing RCW 9.73.030).

¶11 "[W]hether a particular communication is private is generally a question of fact, but one that may be decided as a question of law if the facts are undisputed." *State v. Townsend*, 147 Wn.2d 666, 673, 57 P.3d 255 (2002). Because the Act does not define "private," our Supreme Court has adopted the dictionary definition: " 'belonging to one's self . . . secret . . : intended only for the persons involved (a conversation) . . . holding a confidential relationship to something . . . a secret message: a private communication . . . secretly: not open or in public.' " *Townsend*, 147 Wn.2d at 673 (internal quotation marks omitted) (quoting *Kadoranian v. Bellingham Police Dep't*, 119 Wn.2d 178, 190, 829 P.2d 1061 (1992)).

¶12 A communication is private when (1) the communicating parties manifest a subjective intention that it be private and (2) that expectation is reasonable. *Christensen*, 153 Wn.2d at 193. Factors bearing on the reasonableness of the privacy expectation include the duration and subject matter of the communication, the location of the communication and the potential presence of third parties, and the role of the nonconsenting party and his or her relationship to the consenting party. *Townsend*, 147 Wn.2d

at 673-74. But the mere possibility that interception of the communication is technologically feasible does not render public a communication that is otherwise private. *Townsend*, 147 Wn.2d at 674.

¶13 *Townsend* is instructive with regard to the issues of what constitutes a "private communication" and what constitutes consent. There, police set up a sting operation after receiving tips that Donald Townsend was attempting to use his computer to arrange sexual liaisons with young girls. *Townsend*, 147 Wn.2d at 670. A police detective established an e-mail account with a screen name of "ambergirl87," a fictitious 13-year-old girl. *Townsend*, 147 Wn.2d at 670. Townsend began corresponding with "Amber" via e-mail, asking to meet her and saying that he wanted to " 'have fun' " with her. *Townsend*, 147 Wn.2d at 670. In one e-mail, he asked "Amber" to promise not to " 'tell anyone about us.' " *Townsend*, 147 Wn.2d at 670. The detective's computer automatically stored these e-mail messages, which allowed the detective to read the messages at his leisure and to print them for use as evidence at a later time. *Townsend*, 147 Wn.2d at 670.

¶14 At Townsend's request, the detective, under the guise of Amber, also set up an ICQ account to communicate with Townsend. *Townsend*, 147 Wn.2d at 670. ICQ is a software chat program that allows users to communicate in writing in real time over the Internet. *Townsend*, 147 Wn.2d at 670-71. The ICQ communications between Townsend and Amber contained graphic discussions about sexual topics; in two ICQ messages, Townsend told Amber that he wanted to have sex with her. *Townsend*, 147 Wn.2d at 671.

¶15 The *Townsend* court held, without distinguishing between the e-mail communications and the ICQ communications, that Townsend's communications to the fictitious child were private for purposes of the Act. 147 Wn.2d at 674. The court explained:

[I]t is readily apparent from the undisputed facts that Townsend's subjective intention was that his messages to Amber were

for her eyes only. That intent is made manifest by Townsend's message to Amber to not "tell anyone about us." In addition, the subject matter of Townsend's communications to Amber strongly suggests that he intended the communications to be private. While interception of these messages was a possibility, we cannot say that Townsend's subjective intention that his communications were private was unreasonable under the circumstances.

*Townsend*, 147 Wn.2d at 674 (citation omitted).[4]

¶16 The *Townsend* court concluded, however, that the detective did not violate the Act because Townsend had impliedly consented to the recording of the e-mail messages and ICQ communications by the detective's computer. *Townsend*, 147 Wn.2d at 676. The court cited *In re Marriage of Farr*, 87 Wn. App. 177, 184, 940 P.2d 679 (1997), for the proposition that "a communicating party will be deemed to have consented to having his or her communication recorded when the party knows that the messages will be recorded." *Townsend*, 147 Wn.2d at 675-76. As the *Townsend* court noted, the *Farr* court held that an individual consented to the recording of his voice messages by leaving a message on an answering machine, the only function of which is to record messages. 147 Wn.2d at 676 (citing *Farr*, 87 Wn. App. at 184). The *Townsend* court stated that it "entirely agree[d]" with the Court of Appeals' reasoning that

"[a] person sends an e-mail message with the expectation that it will be read and perhaps printed by another person. To be available for reading or printing, the message first must be recorded on another computer's memory. Like a person who leaves a message on a telephone answering machine, a person

---

[4] The *Townsend* court also clarified that on the issue of whether a communication is private under the Act, it is not dispositive that the same device was used to communicate and to record the communication: "While one could certainly mount a cogent argument for the proposition that the privacy act should not apply when the recording of a transmission is done in a nonsurreptitious way on a device that is also used for communication, the plain language of the statute covers such recording." *Townsend*, 147 Wn.2d at 675 n.2.

who sends an e-mail message anticipates that it will be recorded. That person thus implicitly consents to having the message recorded on the addressee's computer."[5]

147 Wn.2d at 676 (quoting *State v. Townsend*, 105 Wn. App. 622, 629, 20 P.3d 1027 (2001)).

In sum, because Townsend, as a user of e-mail[,] had to understand that computers are, among other things, a message recording device and that his e-mail messages would be recorded on the computer of the person to whom the message was sent, he is properly deemed to have consented to the recording of those messages.

*Townsend*, 147 Wn.2d at 676.

■ ■ ¶17 Under the implied consent reasoning of the court in *Townsend*, Roden impliedly consented to the recording of his text messages on Lee's iPhone. Roden voluntarily sent the text messages to Lee's iPhone with the expectation that Lee would read them. In doing so, he also anticipated that the iPhone would record and store the incoming messages to allow Lee to read them. Cell phones, like computers, are "message recording device[s]," a fact that Roden must have understood as a user of text messaging technology on cell phones. *Townsend*, 147 Wn.2d at 676. Accordingly, Sawyer did not violate Roden's rights under the Act.[6]

¶18 Roden asserts that *Townsend*'s implied consent theory does not apply to the present case. To support this argument, he states:

Unlike in *Townsend*, Detective Sawyer did not save the text messages sent by Roden. Sawyer testified that he saw text

---

[5] The *Townsend* court noted that implied consent was a "closer question" with regard to the ICQ communications. 147 Wn.2d at 676. The court analyzed the nature of the ICQ technology and the relevant terms of the privacy policy before concluding that Townsend had impliedly consented to the recording of the ICQ communications. *Townsend*, 147 Wn.2d at 676-79.

[6] Since the legality of the iPhone's seizure is not at issue, we do not address whether our decision would be different if the seizure were unlawful.

messages from Roden and "typed everything out" in his report. Consequently, the evidence was inadmissible because distinguishable from e-mail and ICQ messages, the saving and printing of messages is not inherent in text messaging.

Appellant's Reply Br. at 2-3 (citation omitted). This argument fails. The relevant question is not whether Sawyer saved or printed the messages, but whether Roden understood that the iPhone would record and store the text messages that he sent to Lee. *See Townsend*, 147 Wn.2d at 676. Because, as a user of text message technology, Roden would have had this understanding, we find sufficient evidence to support the trial court's conclusion that Roden had no reasonable expectation of privacy in his text messages in Lee's phone. Thus, Roden impliedly consented to the recording of the text messages that he sent to Lee's iPhone.[7]

¶19 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

WORSWICK, C.J., concurs.


¶20 VAN DEREN, J. (dissenting in part) — I respectfully dissent on the majority's opinion related to the iPhone[8] search. I would hold that Jonathan Roden did not impliedly consent to Detective Kevin Sawyer's search of Daniel Lee's iPhone and that the police search of Lee's iPhone constituted a violation of the Washington privacy act (Act),

---

[7] The dissent declines to follow *Townsend*, but we view it as binding precedent. And we agree with the *Townsend* court that "[t]he legislature may, however, wish to consider amending the statute in light of developments in technology. It is, as the concurrence correctly suggests, 'in the best position to weigh the competing policies.'" *Townsend*, 147 Wn.2d at 675 n.2 (quoting *Townsend*, 147 Wn.2d at 685 (Bridge, J., concurring)).

[8] *See* majority at 61 n.1.

chapter 9.73 RCW. Additionally, had Roden challenged Sawyer's search of Lee's iPhone on constitutional grounds, I would hold that the search violated article I, section 7 of the Washington State Constitution and the Fourth Amendment to the United States Constitution. Thus, the evidence gathered as a result of the State's unlawful intrusion should be suppressed.

## I.   WASHINGTON PRIVACY ACT

¶21 The majority rests its finding that Roden impliedly consented to Sawyer's search of Lee's iPhone on the fact that Roden knew that the iPhone "would record and store the text messages that he sent to Lee." Majority at 68. This interpretation of the Act reads out of it the protections afforded "any device electronic or otherwise designed to record" private communications. RCW 9.73.030(1)(a). Under the Act, recordings of private communications are protected from police searches absent the issuance of a search warrant, making Roden's knowledge of the fact that a text message was recorded in Lee's iPhone irrelevant. Because the majority's interpretation of the Act jeopardizes or eliminates the Act's express protections, I dissent from the finding and the majority's holding.

¶22 Roden does not contest his convictions based on constitutional challenges under article I, section 7 of our constitution or the Fourth Amendment.[9] Instead, he focuses on his rights under the statutory law contained in the Act.

¶23 The Act provides that

it shall be unlawful for . . . the state of Washington, its agencies, and political subdivisions to intercept, or record any:

(a) Private communication transmitted by telephone, *telegraph*, radio, or other device between two or more individuals

---

[9] This appears to be a strategic decision based on Sawyer's search of Lee's iPhone in at least two separate cases. *See also State v. Hinton*, No. 169 Wn. App. 28, 280 P.3d 476 (2011). Hinton challenges Sawyer's intrusion in Lee's iPhone under both the state and federal constitutions. Hinton's and Roden's appeals were argued the same day in our court.

between points within or without the state *by any device electronic or otherwise designed to record* and/or transmit said communication regardless how such device is powered or actuated, without first obtaining the consent of all the participants in the communication;

(b) Private conversations, by *any device electronic or otherwise designed to record* or transmit such conversation regardless how the device is powered or actuated without first obtaining the consent of all the persons engaged in the conversation.

RCW 9.73.030(1) (emphasis added). Any information obtained in violation of the above sections "shall be inadmissible in any civil or criminal case" in all courts in this state.[10] RCW 9.73.050. The Act must be read to ensure that private conversations are "protected in the face of an ever-changing technological landscape." *State v. Christensen*, 153 Wn.2d 186, 197, 102 P.3d 789 (2004). Additionally, "[i]f any textual ambiguity about the meaning of the statute lingers, it ought to be resolved in favor of giving effect to the legislative intent of the statute," which puts a high value on the privacy of communications. *Christensen*, 153 Wn.2d at 200.

¶24 The Act clearly and expressly affords protection to private communications by telephone, radio, telegraph, and any other electronic device. RCW 9.73.030(1). Our statute is one of the most restrictive privacy acts in the nation because it requires that all parties to a private communication consent to disclosure. *Christensen*, 153 Wn.2d at 198. Indeed, the Act is forward looking and written with a clear anticipation that technology could change, thus its use of the phrase "any device electronic or otherwise designed to record and/or transmit said communication regardless how such device is powered or actuated." RCW 9.73.030(1)(a).

---

[10] Exceptions to this rule include if the person whose rights have been violated in an action brought for damages under RCW 9.73.030 through 9.73.080 gave permission or if the criminal action would jeopardize national security. RCW 9.73.050.

## II. Implied Consent Ignores Express Statutory Language

¶25 *State v. Townsend*, 147 Wn.2d 666, 57 P.3d 255 (2002); *In re Marriage of Farr*, 87 Wn. App. 177, 940 P.2d 679 (1997); and the majority do not acknowledge that the Act protects the communications themselves and also the recording and transmittal of those communications. RCW 9.73.030(1). Thus, the State has been allowed to admit evidence gathered from telephone answering machines (*Farr*) and e-mails (*Townsend*). These decisions abrogate the Act's protection of private communications through the judicially created implied consent doctrine.

¶26 Reliance on implied consent overlooks the Act's protection of written communications and recordings and allows expansive and unregulated State searches of citizens' phone contacts, without probable cause, without a search warrant, and without actual consent. Under implied consent reasoning, a police officer's simple possession of a "smartphone" is sufficient to imply or infer consent of the communicating parties. This reasoning can easily and dangerously be extended to allow warrantless State searches of any digital device that police come to possess, all contrary to the Act itself. Moreover, that has not been the law in Washington with regard to other computers. *See State v. Grenning*, 142 Wn. App. 518, 532, 174 P.3d 706 (2008) (warrant must specifically authorize search of computer), *aff'd*, 169 Wn.2d 47, 234 P.3d 169 (2010); *State v. Nordlund*, 113 Wn. App. 171, 182, 53 P.3d 520 (2002).

¶27 Thus, the trial court should have suppressed the evidence seized as a result of the warrantless search of Lee's iPhone unless one of the narrow exceptions to the warrant requirement applied—none of which are argued here—or unless Roden gave actual consent to State interception of his messages. Accordingly, I would reverse Roden's conviction and would vacate the order denying suppression of the evidence seized from Lee's iPhone.

III.   TEXT MESSAGES AND THE PRIVACY ACT

¶28  In the new world of digital communications, text messages are most similar to telegrams, which are expressly protected by the Act; but text messages are even more obviously private communications due to their direct communication between the sender and recipient. A telegram, on the other hand, requires the sender to engage an operator of one telegraph machine, who sends electrical signals to another telegraph machine in Morse code. The receiving operator decodes the Morse code language, types out the message, and delivers it to the intended recipient. With telegrams, both ends of telegraphic communications include third parties who print and who read the telegram's contents.

¶29  Under *Townsend* and the majority's analysis, the Act does not apply to telegrams because the sender would impliedly consent to the message being recorded, printed, and easily read by intervening parties. Yet the Act expressly protects communications transmitted by telegram.

¶30  Furthermore, *Townsend* and the majority's analytic framework ignore the protections afforded recorded communications. Inferring consent to search any recorded or printed message is contrary to the Act's underlying and expressed intent. The Act clearly required that if Roden and Lee would not consent to Sawyer's search of Lee's iPhone and his manipulation of the iPhone to locate Roden's text messages, the State would have to acquire authorization from a judge or magistrate for the intrusion into Lee's iPhone, a device "designed to record and/or transmit said communication."[11] RCW 9.73.030(1)(a). Sawyer did not receive consent from either Lee or Roden, nor did he receive

_____

[11] A judge or magistrate can "approve the interception, recording, or disclosure of communications or conversations with a nonconsenting party for a reasonable and specified period of time, if there is probable cause to believe that the nonconsenting party has committed, is engaged in, or is about to commit a felony." RCW 9.73.090(2).

authorization from a judge or magistrate to open Lee's iPhone and search its contents and begin communicating with Roden.

¶31 And here, the police did more than view Roden's communications to Lee. The record establishes that "Sawyer spent about 5 or 10 minutes 'looking at some of the text messages' on [Lee's] iPhone; he also looked to see 'who had been calling.'" Majority at 62 (quoting Report of Proceedings (Apr. 29, 2010) at 9). Then, "[p]osing as Lee, Sawyer sent Z-Jon [(Roden)] a text message reply" and engaged in a series of text messages, eventually setting up a meeting at which Roden was arrested. Majority at 62-63.

¶32 Under these circumstances, Roden, who did not intend to communicate with Sawyer, did not consent to Sawyer's search of Lee's iPhone, to Sawyer's use of the phone, or to the use of the iPhone communications against him in criminal proceedings. Resorting to implied consent under the Act simply abrogates citizens' protections from searches that violate our rigorous Act and constitutional privacy rights.

¶33 Following the majority's analysis, any communication that has a traceable electronic or paper trail will not be protected because consent to disclosure can be implied from the trail. This is clearly contrary to the legislature's intent when it created the Act, which explicitly included protections for telegrams and any device designed to record. The legislature intended to protect private communications regardless of how such communications were transmitted. The Act was not intended or written so that it could be interpreted to abrogate constitutional privacy protections or to invite its own abrogation based on implied consent when communications are achieved utilizing a protected means of communication.

IV. THE PRIVACY ACT DOES NOT ABROGATE ARTICLE I, SECTION 7 PROTECTIONS

¶34 "'When a party claims both state and federal constitution violations, we turn first to our state constitution.'"

*State v. Afana*, 169 Wn.2d 169, 176, 233 P.3d 879 (2010) (quoting *State v. Patton*, 167 Wn.2d 379, 385, 219 P.3d 651 (2009)). Article I, section 7 of our state constitution states, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." In determining whether a search violated article I, section 7, we engage in a two-step analysis. The first step requires us to determine whether the State has intruded into a person's private affairs. *State v. Valdez*, 167 Wn.2d 761, 772, 224 P.3d 751 (2009). "The term 'private affairs' generally means 'those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass.'" *State v. Athan*, 160 Wn.2d 354, 366, 158 P.3d 27 (2007) (quoting *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984)). "In determining if an interest constitutes a 'private affair,' we look at the historical treatment of the interest being asserted, analogous case law, and statutes and laws supporting the interest asserted." *Athan*, 160 Wn.2d at 366. *Townsend* clearly determined that electronic communications were private. 147 Wn.2d at 674. The *Townsend* court stated:

> We hold, as did the Court of Appeals, that Townsend's communications to the fictitious child, Amber, were private. We reach that conclusion because it is readily apparent from the undisputed facts that Townsend's subjective intention was that his messages to Amber were for her eyes only. That intent is manifest by Townsend's message to Amber to not "tell anyone about us." [*Townsend* Clerk's Papers] at 66. In addition, the subject matter of Townsend's communications to Amber strongly suggests that he intended the communications to be private. While interception of these messages was a possibility, we cannot say that Townsend's subjective intention that his communications were private was unreasonable under the circumstances.

147 Wn.2d at 674.

¶35 Here, as in *Townsend*, it is clear that Roden intended his communications arranging an illegal drug transaction

to be private. And, as the *Townsend* court noted, "The mere possibility that interception of the communication is technologically feasible does not render public a communication that is otherwise private." 147 Wn.2d at 674; *see also State v. Faford*, 128 Wn.2d 476, 486, 910 P.2d 447 (1996) ("We will not permit the mere introduction of new communications technology to defeat the traditional expectation of privacy in telephone conversations."). Likewise, the possibility that another person could potentially access Lee's iPhone and read Lee's text messages does not render Roden's private communications public.

¶36 Although by sending a text message to Lee's iPhone, Roden risked Lee exposing his communications to others and risked that his communications would become known to law enforcement through a valid search pursuant to a search warrant, it does not diminish his expectation that his text messages would not be subject to a warrantless search by government agents. *See State v. Eisfeldt*, 163 Wn.2d 628, 637, 185 P.3d 580 (2008) ("[A]rticle I, section 7 protects 'those privacy interests which citizens of this state have held, and should be entitled to hold, safe from *governmental trespass absent a warrant*.'" (emphasis added) (quoting *Myrick*, 102 Wn.2d at 511)).

¶37 It is worth noting that most mobile phone owners are in immediate possession of their phones at all times.[12] The fact these portable computer phones, as opposed to a land line telephone, are so closely associated with an individual lends credence to the conclusion that a sender of a text message has a privacy interest that the phone's owner will be the immediate recipient of the message and,

---

[12] Cell phones are commonly provided by employers so that employees are expected to be checking them throughout the day. Many employers also permit cell phones to be within reach all day so that work lines will not be tied up with personal calls. *See* Br. of Electronic Frontier Foundation et al. as Amici Curiae in Supp. of Resp'ts, *City of Ontario v. Quon*, No. 08-1332, 2010 WL 1063463, at *16 (U.S. Mar. 23, 2010); *see generally* Katharine M. O'Connor, Note, *:o OMG They Searched My Txts: Unraveling the Search and Seizure of Text Messages*, 2010 U. Ill. L. Rev. 685.

thus, the sender can expect that the message will remain private absent voluntary action by the phone's owner to disclose the contents of the text message. And, in many respects, the user of text messages has a greater privacy interest in text messages than in oral conversations because oral conversations can be overheard.[13] In contrast to oral conversations, text messages are insulated from the accidental or deliberate eavesdropper unless the eavesdropper possesses the receiving phone.

¶38 While it is technically possible for every text message sent from one smartphone to another smartphone to be tracked and viewed by people other than the recipient, this technological ability also does not negate a text message user's privacy interests, particularly from the government's unwarranted, prying eye. " 'Privacy is not a discrete commodity, possessed absolutely or not at all.' " *United States v. Jones*, ___ U.S. ___, 132 S. Ct. 945, 947, 181 L. Ed. 2d 911 (2012) (Sotomayor, J., concurring) (quoting *Smith v. Maryland*, 442 U.S. 735, 749, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979) (Marshall, J., dissenting)). As Justice Marshall so eloquently stated in 1979:

> [B]ut even assuming, as I do not, that individuals "typically know" that a phone company monitors calls for internal reasons, it does not follow that they expect this information to be made available to the public in general or the government in particular. Privacy is not a discrete commodity, possessed absolutely or not at all. Those who disclose certain facts to a bank or phone company for a limited business purpose need not assume that this information will be released to other persons for other purposes.
>
> . . . .
>
> Implicit in the concept of assumption of risk is some notion of choice. . . . [U]nless a person is prepared to forgo use of what for many has become a personal or professional necessity, he

---

[13] "The [text message] user seeks to exclude the communication from the uninvited ear by avoiding speaking into the mouthpiece altogether." O'Connor, at 713.

cannot help but accept the risk of surveillance. It is idle to speak of "assuming" risks in contexts where, as a practical matter, individuals have no realistic alternative.

*Smith*, 442 U.S. at 749-50 (Marshall, J., dissenting) (footnote and citations omitted).

## V. THE PRIVACY ACT DOES NOT ABROGATE THE FOURTH AMENDMENT

¶39 The Supreme Court has had recent occasion to address new technology's impact on the foundational privacy right expressed by the Fourth Amendment. Although not directly addressing whether individuals retain a reasonable expectation of privacy in text messages sent to third parties, two recent United States Supreme Court cases suggest that the public has a reasonable expectation of privacy in cell phone and text message communications.

¶40 In *City of Ontario v. Quon*, 560 U.S. 746, 130 S. Ct. 2619, 177 L. Ed. 2d 216 (2010), the United States Supreme Court addressed an employee's use of an employer-provided pager. Although recognizing that the case touched "issues of farreaching significance" and discussed "employees' privacy expectations vis-à-vis employer provided technological equipment," the Court declined to address whether Quon had a reasonable expectation of privacy in his text messages. *Quon*, 130 S. Ct. at 2624, 2630. Instead, the *Quon* Court held that even assuming Quon had a reasonable expectation of privacy, the search of text messages contained on his employer-owned pager for work-related purposes was reasonable. 130 S. Ct. at 2630-31. However, the *Quon* Court strongly suggested that outside the employee-employer context, the public would have a reasonable expectation of privacy in text message communications, noting:

Cell phone and text message communications are so pervasive that some persons may consider them to be essential means or necessary instruments for self-expression, even self-identifica-

tion. That might strengthen the case for an expectation of privacy [in the employee-employer context]. On the other hand, the ubiquity of those devices has made them generally affordable, so one could counter that employees who need cell phones or similar devices for personal matters can purchase and pay for their own.

*Quon*, 130 S. Ct. at 2630.

¶41 The *Quon* Court also equated the search of a personal e-mail account or pager with a wiretap of a person's phone line. 130 S. Ct. at 2631. Thus, the Supreme Court in *Quon* strongly suggested that an individual has a reasonable expectation of privacy in text messages under the Fourth Amendment.[14]

---

[14] Other courts have found that individuals have a reasonable expectation of privacy in their cell phones and the information contained on their cell phones, including text messages. *See, e.g., United States v. Zavala*, 541 F.3d 562, 577 (5th Cir. 2008) ("[C]ell phones contain a wealth of private information, including emails, text messages, call histories, address books, and subscriber numbers"; thus, defendant had a "reasonable expectation of privacy regarding [the cell phone's contents]."); *United States v. Finley*, 477 F.3d 250, 259 (5th Cir. 2007) (A defendant had reasonable expectation of privacy in the text messages stored on his cell phone because he had possessory interest in the phone and took "normal precautions to maintain his privacy in the phone."); *United States v. Davis*, 787 F. Supp. 2d 1165, 1170 (D. Or. 2011) ("A person has a reasonable expectation of privacy in his or her personal cell phone, including call records and text messages."); *United States v. Quintana*, 594 F. Supp. 2d 1291, 1299 (M.D. Fla. 2009) ("[A] search warrant is required to search the contents of a cell phone unless an exception to the warrant requirement exists."); *State v. Smith*, 124 Ohio St. 3d 163, 169, 2009-Ohio-6426, 920 N.E.2d 949 (Cell phone users have "a reasonable and justifiable expectation of a higher level of privacy in the information [cell phones] contain" because of their multifunctional uses and ability to store large amounts of private data, including text messages.). *But cf. United States v. Flores-Lopez*, 670 F.3d 803 (7th Cir. 2012) (police officers may conduct a warrantless search of arrestee's cell phone to obtain the cell phone number).

Admittedly, these cases do not address an individual's expectation of privacy in text messages that are communicated to a third party. However, the Sixth Circuit Court of Appeals has held that "the mere *ability* of a third-party intermediary to access the contents of a communication cannot be sufficient to extinguish a reasonable expectation of privacy." *United States v. Warshak*, 631 F.3d 266, 286 (6th Cir. 2010). The *Warshak* court held:

A subscriber enjoys a reasonable expectation of privacy in the contents of emails "that are stored with, or sent or received through, a commercial [Internet service provider (ISP)]." The government may not compel a commercial ISP to turn over the contents of a subscriber's emails without first obtaining a warrant based on probable cause. Therefore, because they did not

¶42 In *Jones*, the Court held that the installation of a global-positioning-system (GPS) tracking device on a vehicle registered to the respondent's wife constituted a search. 132 S. Ct. at 946. This opinion has been the subject of much discussion and conjecture about how the Supreme Court will interpret the State's use of technology to intrude on individual citizens and their activities.[15]

¶43 The majority opinion in *Jones*, authored by Justice Scalia, first denied the government's contention that no search had occurred since Jones had "no reasonable expectation of privacy" in his vehicle's locations on the public roads, which were visible to all. *Jones*, 132 S. Ct. at 957 (Sotomayor, J., concurring). The denial of this contention was partially based on the fact that the officers in the case " 'did *more* than conduct a visual inspection of respondent's vehicle.' By attaching the device to the Jeep, officers en-

---

obtain a warrant, the government agents violated the Fourth Amendment when they obtained the contents of Warshak's emails. Moreover, to the extent that the [Stored Communications Act (SCA), 18 U.S.C. section 2703] purports to permit the government to obtain such emails warrantlessly, the SCA is unconstitutional.

631 F.3d at 288 (quoting *Warshak v. United States*, 490 F.3d 455, 473 (6th Cir. 2007)).

I would hold that the *Warshak* court's rationale in establishing individuals' reasonable expectations of privacy in the contents of their e-mail is equally applicable to cell phone users' expectation of privacy in the contents of their text messages. I would also extend the *Warshak* court's holding to prohibit a warrantless search by government agents of text messages sent to and stored on a third party's cell phone. In my view, a third party's ability to access text messages sent by an individual does not diminish the text message sender's expectation of privacy in his or her text message communications.

[15] *See, e.g.*, Tom Goldstein, Jones *Confounds the Press*, SCOTUSBLOG (Jan. 25, 2012, 11:30 AM), http://www.scotusblog.com/2012/01/jones-confounds-the-press; Jess Bravin, *Justices Rein in Police on GPA Trackers*, WALL ST. J., Jan. 24, 2012, at A1, *available at* http://online.wsj.com/article/SB10001424052970203806504577-178811800873358.html?mod=WSJ_hp_LEFTTopStories; Tom Goldstein, *Reactions to* Jones v. United States: *The Government Fared Much Better than Everyone Realizes*, SCOTUSBLOG (Jan. 23, 2012, 4:07 PM), http://www.scotusblog.com/2012/01/reactions-to-jones-v-united-states-the-government-fared-much-better-than-everyone-realizes; Orin Kerr, *What's the Status of the Mosaic Theory after* Jones, VOLOKH CONSPIRACY (Jan. 23, 2012, 1:59 PM), http://volokh.com/2012/01/23/whats-the-status-of-the-mosaic-theory-after-jones; Lyle Denniston, *Opinion Recap: Tight Limit on Police GPS Use*, SCOTUSBLOG (Jan. 23, 2012, 11:58 AM), http://www.scotusblog.com/2012/01/opinion-recap-tight-limit-on-police-gps-use.

croached on a protected area." *Jones*, 132 S. Ct. at 952 (citation omitted) (quoting Br. of U.S., 2011 WL 3561881, at *41). The Court has previously recognized that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection." *Bond v. United States*, 529 U.S. 334, 337, 120 S. Ct. 1462, 146 L. Ed. 2d 365 (2000).

¶44 Similarly here, Sawyer did more than conduct a visual inspection of Lee's iPhone. As anyone who has seen or used an iPhone knows, looking at text messages and looking to see who has been calling an iPhone requires that the person search the iPhone's list of contacts and messages, as the record reflects happened here. Sawyer engaged in an invasive inspection and then engaged Roden in conversation while posing as Lee.

¶45 Justice Sotomayor, in her concurring opinion in *Jones*, emphasized the privacy concerns that new technologies force courts to confront:

> More fundamentally, it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties. *E.g.*, *Smith*, 442 U.S. at 742; *United States v. Miller*, 425 U.S. 435, 443, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. People disclose the phone numbers that they dial or text to their cellular providers; the [uniform resource locator]s that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers. Perhaps, as Justice ALITO notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not. I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy

as a prerequisite for privacy. I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

132 S. Ct. at 957 (citations omitted) (quoting *Jones*, 132 S. Ct. at 962 (Alito, J., concurring)).

¶46 I agree with Justice Sotomayor and would hold that such information should not be disentitled to state constitutional protection either. I would hold under both article I, section 7 and the Fourth Amendment that the State violated Roden's privacy rights and that the fruit of the illegal search of Lee's iPhone should have been suppressed.

VI. THE PREVALENCE OF TEXT MESSAGES REQUIRES A NEW LOOK AT PRIVACY PROTECTIONS

¶47 Holding that Roden consented to Sawyer recording his text messages to Lee simply fails to take into account evolving notions of privacy in a society increasingly reliant on electronic forms of communication. For example, in *Quon*, amici curiae in support of respondent Quon presented statistical data on the prevalence of electronic forms of communication to support the argument that society recognizes an expectation of privacy in text messages. The amicus brief states:

A 2009 survey found that 85% of adults owned a mobile phone. Approximately nine out of ten adults use a mobile phone and one in seven adults owns *only* a mobile phone. Furthermore, 14.5% of American homes received "all or almost all" calls on wireless telephones, even if there also was a landline telephone in the house. Stephen J. Blumberg & Julian Luke, *Wireless Substitution: Early Release of Estimates From the National Health Interview Survey*, CDC National Center for Health Statistics, July-December 2008, http://tiny.cc/cdcnihstats. . . .

. . . .

Texting, along with the related services for transmitting photos and videos between phones, has become an extremely popular form of communication, with an average of 4.1 billion text messages sent and received in the nation *each day*.

> Many Americans today use text messages to convey information that formerly would have been the subject of an oral telephone conversation. According to a 2008 Nielson Mobile survey, U.S. mobile subscribers "sent and received on average 357 text messages per month [in the second quarter of 2008], compared with making and receiving 204 phone calls a month. . . . " Marguerite Reardon, *Americans Text More Than They Talk*, CNET, Sept. 22, 2008, http://tiny.cc/CNET.

Br. of Electronic Frontier Foundation et al. as Amici Curiae in Supp. of Resp'ts, *City of Ontario, Cal. v. Quon*, No. 08-1332, 2010 WL 1063463, at *6-8 (U.S. Mar. 23, 2010) (Br. of EFF) (footnotes and citation omitted).

¶48 Statistical data on the prevalence of electronic communications clearly demonstrate that the sending and receiving of text messages on a cell phone, "texting,"[16] has become the predominant form of communication.[17] And American teenagers, in particular, engage in substantially more text messages per day than phone calls, and certainly more than letters.[18] This emerging data establishes, and courts cannot ignore, a clear shift in Americans' private communications from older forms of postal mail, telephone, and face-to-face conversations to text and e-mail messages generated and stored on smartphones. Br. of EFF, 2010 WL 1063463, at *10; *see generally* Katharine M. O'Connor, Note, *:o OMG They Searched My Txts: Unraveling the Search and Seizure of Text Messages*, 2010 U. ILL. L. REV. 685, 687-88.

¶49 Courts must analyze these new forms of communication within the context of our society's evolving and

---

[16] Text messaging, also known as short message service (SMS) or "texting," uses cell phones or pagers to send and receive electronic written messages.

[17] Text message use is expected to continue to surge. "One study estimated that there were 5 trillion SMS texts sent worldwide in 2009 and that there will be more than 10 trillion SMS texts sent worldwide in 2013." Br. of EFF, 2010 WL 1063463, at *9.

[18] One study found that American teenagers sent an average of 3,146 texts per month. Br. of EFF, 2010 WL 1063463, at *9.

existing expectations of privacy.[19] As the Supreme Court recognized in *Quon*, "Rapid changes in the dynamics of communication and information transmission are evident not just in the technology itself but in what society accepts as proper behavior." 130 S. Ct. at 2629; *see also United States v. Warshak*, 631 F.3d 266, 285 (6th Cir. 2010) ("[T]he Fourth Amendment must keep pace with the inexorable march of technological progress, or its guarantees will wither and perish." (citing *Kyllo v. United States*, 533 U.S. 27, 34, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001))).

¶50 Never would our constitutional framers have anticipated that technology would expose citizens to nonconsensual and unexamined State intrusion into their private affairs. Recognizing the prevalence of individual electronic communication on handheld computers, i.e., smartphones, and society's evolving notions of privacy in those communications, I would hold that the officer's warrantless search of Lee's iPhone to obtain Roden's text messages and his address violated Roden's privacy interests absent an exception to the warrant requirement.

¶51 Broadly interpreted, the majority's holding provides that all citizens of this state consent to police intrusion of their cell phone communications and that they have no expectation of privacy in any form of electronic communication under either the Act or our state or federal constitution. That holding undermines every individual's legitimate

---

[19] Well established case law under the Fourth Amendment provides that a sender of a letter or other sealed package has a reasonable, and legitimate, expectation of privacy in those articles *until* they are delivered to the recipient. *See, e.g., United States v. Jacobsen*, 466 U.S. 109, 114, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984). This doctrine is unworkable in the electronic communication context because electronic messages are delivered nearly instantaneously and, thus, would leave the sender of electronic communications with no expectation of privacy.

privacy interests in communications afforded by evolving and existing technology.[20]

¶52  Accordingly, I dissent.

Review granted at 175 Wn.2d 1022 (2012).

---

[20] Should this be the law in Washington, every cell phone user—including youth who tend to use these phones without discretion—should necessarily be warned that the State may search their or their friends' cell phones without a legally issued search warrant based on probable cause. This result cannot help but offend constitutional notions of individual protections from unwarranted State intrusion into private affairs.