# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE **FEB 2 7 2014**

*Madsen C.J.*
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Feb. 27, 2014

Ronald R. Carpenter
Supreme Court Clerk

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 87669-0 |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| JONATHAN NICHOLAS RODEN, | ) | |
| | ) | |
| Appellant. | ) | Filed **FEB 2 7 2014** |
| | ) | |

GONZÁLEZ, J.—We are asked to decide whether Washington's privacy act protects text messages intercepted by a detective who possessed the intended recipient's cell phone after a warrantless seizure. A police detective spent 5 to 10 minutes browsing through a cell phone officers took from Daniel Lee incident to his arrest for possession of heroin. The detective noticed several text messages from Jonathan Roden, responded to Roden with a new text message, and arranged a drug deal. Roden was consequently arrested. Roden contends that the detective's conduct violated the privacy act and the state and federal constitutions.

We agree that Washington's privacy act was violated because a detective intercepted private communications without Lee's or Roden's consent or a warrant. We reverse the Court of Appeals' decision and Roden's conviction.

BACKGROUND

Longview police arrested Lee for possession of heroin and seized his iPhone. The iPhone, which continually received calls and messages at the police station, was handed over to Detective Kevin Sawyer when he started his shift that evening. The police apparently did not place the phone in an evidence or inventory locker or otherwise secure it after Lee's arrest. The record does not indicate how long officers kept possession of the phone before giving it to Detective Sawyer.

Detective Sawyer looked through the iPhone for about 5 or 10 minutes and saw a text message from a contact identified as "Z–Jon." It read, "I've got a hundred and thirty for the one-sixty I owe you from last night." Verbatim Report of Proceedings (VRP) (Apr. 29, 2010) at 11. Posing as Lee, Sawyer sent Z–Jon a text message reply, asking him if he "needed more." *Id.* Z–Jon responded, "Yeah, that would be cool. I still gotta sum, but I could use some more. I prefer to just get a ball, so I'm only payin' one eighty for it, instead of two Ts for two hundred." *Id.* Detective Sawyer recognized that Z-Jon was using drug terminology, and through a series of exchanged messages, Detective Sawyer arranged a meeting with Z-Jon purportedly to sell him heroin. When Roden arrived for the transaction, he was arrested.

Roden was charged with attempted possession of heroin. Roden moved to suppress the evidence obtained from the iPhone, claiming the evidence was obtained in violation of article I, section 7 of the Washington State Constitution, the privacy act, and the Fourth Amendment to the United States Constitution. The trial court denied the suppression motion and found Roden guilty on stipulated facts.

On appeal, Roden argued that the detective's conduct violated the privacy act. The Court of Appeals affirmed. *State v. Roden*, 169 Wn. App. 59, 279 P.3d 461 (2012), and Roden petitioned this court for review under both the privacy act and the state and federal constitutions. We accepted review. *State v. Roden*, 175 Wn.2d 1022, 291 P.3d 253 (2012).

## STANDARD OF REVIEW

This court reviews a trial court's legal conclusions on a motion to suppress de novo. *State v. Schultz*, 170 Wn.2d 746, 753, 28 P.3d 484 (2011) (citing *State v. Smith*, 165 Wn.2d 511, 516, 199 P.3d 386 (2009)).

## ANALYSIS

Washington's privacy act broadly protects individuals' privacy rights. *See* ch. 9.73 RCW; *State v. Williams*, 94 Wn.2d 531, 548, 617 P.2d 1012 (1980). It is one of the most restrictive electronic surveillance laws ever promulgated. *State v. Faford*, 128 Wn.2d 476, 481, 910 P.2d 447 (1996) (citing *State v. O'Neill*, 103 Wn.2d 853, 878, 700 P.2d 711 (1985) (Dore, J., concurring in part, dissenting in part)). The act prohibits anyone not operating under a court order from intercepting or recording

certain communications without the consent of all parties. RCW 9.73.030, .040, .090(2). Overall, the act "significantly expands the minimum standards of the federal statute[, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520,] and offers a greater degree of protection to Washington citizens." *O'Neill*, 103 Wn.2d at 879 (Dore, J. concurring in part, dissenting in part).

The act states:

[I]t shall be unlawful for . . . the state of Washington, its agencies, and political subdivisions to intercept, or record any:

(a) Private communication transmitted by telephone, telegraph, radio, or other device between two or more individuals between points within or without the state by any device electronic or otherwise designed to record and/or transmit said communication regardless how such device is powered or actuated, without first obtaining the consent of all the participants in the communication.

RCW 9.73.030(1).[1] Evidence obtained in violation of the act is inadmissible for any purpose at trial. RCW 9.73.050.

There are four prongs we consider when analyzing alleged violations of the privacy act. There must have been (1) a private communication transmitted by a device, which was (2) intercepted or recorded by use of (3) a device designed to record and/or transmit (4) without the consent of all parties to the private

---

[1] The statute provides for several exceptions that are not relevant here. For example, police and fire departments are permitted to record incoming telephone calls. RCW 9.73.090(1). It is also lawful to intercept oral communications when one party consents and an officer has obtained a court order based on probable cause to believe that the nonconsenting party has committed, is engaged in, or is about to commit a felony. RCW 9.73.090(2). Finally, interception or recording is permitted upon a finding by a judge or magistrate that there is probable cause to believe that the communication concerns enumerated criminal acts relating to controlled substances. RCW 9.73.090(5).

4

communication. *State v. Christensen*, 153 Wn.2d 186, 192, 102 P.3d 789 (2004) (citing RCW 9.73.030). At issue here is whether the text messages were "private communications" and if so, whether they were "intercepted" within the meaning of the statute. We answer both questions affirmatively and do not reach Roden's constitutional arguments.[2]

A.      *Whether the Text Messages Were Private Communications*

The act does not define the word "private," but we have adopted the dictionary definition: "'belonging to one's self . . . secret . . . intended only for the persons involved (a conversation) . . . holding a confidential relationship to something . . . a secret message: a private communication . . . secretly: not open or in public.'" *State v. Townsend*, 147 Wn.2d 666, 673, 57 P.3d 255 (2002) (internal quotation marks omitted) (quoting *Kadoranian v. Bellingham Police Dep't*, 119 Wn.2d 178, 190, 829 P.2d 1061 (1992)). The question of whether a particular communication is private is generally a question of fact, but one that may be decided as a question of law if the facts are undisputed. *Id.* (citing *State v. Clark*, 129 Wn.2d 211, 225, 916 P.2d 384 (1996)). In determining whether a communication is private, we consider the subjective intention of the parties and may also consider other factors that bear on the reasonableness of the participants' expectations, such as the duration and subject matter of the communication, the location of the communication, and the presence of

---

[2] We accepted review of another case stemming from this set of facts, and there we had occasion to consider whether a text message conversation is protected under article I, section 7 of the Washington State Constitution. *State v. Hinton*, No. 87663-1 (Wash. Feb. 27, 2014).

potential third parties. *Id.* at 673-74 (citing *Clark,* 129 Wn.2d at 225-27). We will generally presume that conversations between two parties are intended to be private. *State v. Modica,* 164 Wn.2d 83, 89, 186 P.3d 1062 (2008).

Roden's messages to Lee were private communications. Text messages encompass many of the same subjects as phone conversations and e-mails, which have been protected under the act. *See Faford,* 128 Wn.2d at 488; *Christensen,* 153 Wn.2d at 200-01; *Townsend,* 147 Wn.2d at 680. Roden manifested his subjective intent that the text messages would remain private by sending them to the cell phone of a personal contact. Roden did not use a group texting function, which enables text messages to be exchanged between multiple parties, or indicate in any other manner that he intended to expose his communications to anyone other than Lee. *See* VRP (Apr. 29, 2010) at 25. Moreover, the illicit subject matter of Roden's text messages indicates that he trusted the communication was secure and private.

We reject the State's argument that a subjective expectation of privacy in a text message conversation is unreasonable because of the possibility that someone could intercept text messages by possessing another person's cell phone. In the context of new communications technology, we have continually held that the mere possibility of intrusion will not strip citizens of their privacy rights. *Faford,* 128 Wn.2d at 485 (citing *State v. Young,* 123 Wn.2d 173, 186, 867 P.2d 593 (1994); *State v. Myrick,* 102 Wn.2d 506, 513-14, 688 P.2d 151 (1984)); *see also Townsend,* 147 Wn.2d at 678.

Sophisticated text messaging technology enables "[l]ayered interpersonal communication[s]" that reveal "intimate . . . thoughts and emotions to those who are expected to guard them from publication." *State v. Patino*, No. P1-10-1155A, slip op. at 83, 70 (R.I. Super. Ct. Sept. 4, 2012). Text messaging is an increasingly prevalent mode of communication and text messages are raw and immediate communications. *State v. Hinton*, No. 87663-1, slip op. at 16 (Wash. Feb. 27, 2014). Individuals closely associate with and identify themselves by their cell phone numbers, such that the possibility that someone else will possess an individual's phone is "unreflective of contemporary cell phone usage." *Patino*, slip op. at 70.

The possibility that an unintended party can intercept a text message due to his or her possession of another's cell phone is not sufficient to destroy a reasonable expectation of privacy in such a message. The Court of Appeals below relied on *State v. Wojtyna*, 70 Wn. App. 689, 855 P.2d 315 (1993), where it noted that one who transmits a message to a pager "'runs the risk that the message will be received by whomever is in possession of the pager.'" 70 Wn. App. at 694 (quoting *United States v. Meriwether*, 917 F.2d 955, 959 (6th Cir. 1990)). The Court of Appeals' reliance on *Wojtyna* overlooks the significant differences between pager and text message communications. There, the court held that Wojtyna's phone number, as displayed on a pager that he messaged, was not a private communication under the privacy act. *Id.* at 695-96. The back-and-forth text messaging conversation here is much more like e-mail exchanges and telephone calls—which the act plainly protects—than a simple

informational statement that is sent to a pager. Unlike pagers, cell phones convey substantive, often confidential information and provide options to password-protect their contents. As text messaging increasingly becomes a substitute for more traditional forms of immediate communication, text messages should be afforded the same protections from interception that are recognized for telephone conversations. *See State v. Clampitt*, 364 S.W.3d 605, 611 (Mo. Ct. App. 2012) (noting that "society's continued expectation of privacy in communications made by letter or phone call demonstrates its willingness to recognize a legitimate expectation of privacy in the contents of text messages"). We have repeatedly affirmed traditional expectations of privacy in the context of new communications technology notwithstanding some possibility of interception.

We find *Townsend* more instructive than *Wojtyna*. In *Townsend*, a detective set up a sting operation by establishing an Internet e-mail account and an ICQ chat room account using a screen name of Amber, a fictitious 13-year-old girl. 147 Wn.2d at 674. Townsend began communicating with Amber, sending e-mails and ICQ messages containing graphic discussions about sexual topics. *Id.* at 671. The detective eventually made arrangements with Townsend to meet Amber at a motel to have sex. *Id.* We held that Townsend's "subjective intention that his communications were private was [not] unreasonable under the circumstances," even though "interception of these messages was a possibility." *Id.* at 674. We concluded that the

communications were private but that Townsend consented to the recording and therefore the act was not violated. *Id.* at 678-79.

Similarly, in *Faford*, when the Fafords' neighbor purchased a police scanner and eavesdropped on their cordless telephone conversations about a marijuana grow operation, we were presented with the question of whether the act protected phone calls made using the then-new technology of cordless telephones. 128 Wn.2d 476. We noted that "[d]efendants . . . clearly intended the information related in their telephone conversations to remain confidential . . . regardless of their use of a cordless telephone instead of a conventional telephone," and we found that the scanner interception violated the privacy act. *Id.* at 485, 488.

In *Christensen*, we held it was a violation of the privacy act for a woman to listen to her daughter's phone conversation using the speakerphone function of the base unit of the cordless phone. 153 Wn.2d 186. The ease with which the interception could take place did not defeat the daughter's reasonable expectation of privacy in her phone call. *Id.* at 193.

Like in *Townsend*, *Faford*, and *Christensen*, it is evident that Roden intended for his communications to remain private, and despite the possibility of intrusion due to the medium he used, Roden did not voluntarily expose his communications to the public in a way that removes them from protection under the act. *See Hinton*, slip op. at 11-14. We have found information willingly imparted to an unidentified stranger falls outside the protection of the act, as do some conversations that take place in "the

presence of one or more third parties" in a "marketplace atmosphere." *Clark*, 129 Wn.2d at 228. But the text messages here did not involve statements voluntarily made to strangers or routine sales conversations on public streets. *Cf. Clark*, 129 Wn.2d at 228; *Kadoranian*, 119 Wn.2d at 190 (concerning inconsequential nonincriminating statements made to a stranger); *State v. Goucher*, 124 Wn.2d 778, 881 P.2d 210 (1994) (voluntary statements made to a stranger). Roden's text messages were private communications that the act protects from interception.

B.    *Whether There Was an Interception or a Recording by a Device*

The Court of Appeals resolved this case under *Townsend*, finding there was no violation of the privacy act because Roden impliedly consented to the recording of his text messages. *Roden*, 169 Wn. App. at 67 (noting that Roden "anticipated that the iPhone would record and store the incoming messages"). But *Townsend* turned on a different question than the one presented here. In *Townsend*, we held that Townsend's communications to Amber were private, but that the act was not violated because Townsend knew e-mails are inherently recorded and thus he impliedly consented to the recording. 147 Wn.2d at 678-79. Here, the question is not whether a recording was lawful; the question is whether the messages were *intercepted* under the act. Because we find the privacy act was violated by the interception of the private text messages, we do not address whether they were unlawfully "recorded" within the meaning of the act.

The messages that Roden sent to Lee were opened, read, and responded to by an officer before they reached Lee. The statute does not define the term "intercept." Where there is no statutory definition to guide us, words should be given their ordinary meaning. *See State v. Athan*, 160 Wn.2d 354, 369, 158 P.3d 27 (2007) (looking to ordinary meaning—often supplied by dictionaries—to determine whether saliva on an envelope is a "communication" within the scope of the privacy act); *Kadoranian*, 119 Wn.2d 178 (looking to the ordinary definition of "private"). Finding the detective's action to be an interception is consistent with the ordinary definition of "intercept"—to "stop . . . before arrival . . . or interrupt the progress or course." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1176 (2002). Unlike in *Townsend*, where the defendant communicated directly with the officer's fictitious online profile, the detective here intercepted text messages directed to an actual acquaintance.

We reject the contention that the detective did not intercept the messages because he was a party to the communication. Amicus curiae Washington Association of Prosecuting Attorneys (WAPA) cites foreign case law finding that a caller cannot claim an interception of a private communication where that caller elected to continue a phone conversation with an officer who answered a third party's phone and posed as the intended recipient of the call or as that person's accomplice. *See, e.g., United States v. Pasha*, 332 F.2d 193, 198 (7th Cir. 1964), *cert. denied*, 379 U.S. 839, 85 S. Ct. 75, 13 L. Ed. 2d 45 (1964); *State v. Lamontagne*, 136 N.H. 575,

618 A.2d 849 (1992). *But see United States v. Chong In Kim*, 803 F. Supp. 352 (D. Haw. 1992) (finding an unlawful interception where an officer who possessed a suspect's phone pursuant to a statutory forfeiture provision answered it and impersonated the suspect). While a caller placing a voice call hears the recipient's voice and has the opportunity to detect deception, sending a text is more like mailing a letter. The sender addresses mail to a particular individual and reasonably expects the communication to be routed to and received by the addressee. Reading a letter addressed to another individual certainly does not render that person the intended recipient, and the ordinary meaning of "intercept" would encompass opening and reading a letter in someone else's mailbox before they receive it. *See* WEBSTER'S, *supra*, at 1176.

WAPA also suggests that there was no interception because once the text messages reached the phone, they were in electronic storage and fell outside the scope of the act. *See* Br. of Amicus Curiae WAPA at 12. WAPA calls to our attention to federal cases that exclude stored electronic and wire communications from the protection of the federal wiretap statute. *United States v. Steiger*, 318 F.3d 1039, 1048 (11th Cir. 2003); *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113 (3d Cir. 2003); *Konop v. Haw. Airlines, Inc.*, 302 F.3d 868, 876 (9th Cir. 2002).

Federal cases on this issue are not instructive given the significant differences between the state and federal statutory schemes. The federal statute defines terms with greater technical specificity and expressly governs stored communications under

separate provisions, evidencing Congress' intent to treat communications differently based on technical distinctions. *See Steiger*, 318 F.3d at 1048; 18 U.S.C. § 2510. The Washington statute does not include technical definitions or independent provisions for stored communications, and we have consistently interpreted its terms broadly. *See, e.g., State v. Gunwall*, 106 Wn.2d 54, 69, 720 P.2d 808 (1986) (concluding that a pen register intercept comes within the definition of a "private communication transmitted by telephone"). In *Christensen*, we declined to find that interception can occur only with a device separate from the one used to communicate, 153 Wn.2d at 197, and in *Faford*, we rejected the trial court's narrow definition of "transmit" and expressly chose an alternative and broad definition "[i]n light of the breadth of the act's purpose," 128 Wn.2d at 483-84.

Detective Sawyer did not merely see a message appear on the iPhone. Instead, he manipulated Lee's phone, responded to a previous text from Roden, and intercepted the incoming text messages before they reached Lee. Whether it is also a violation of the act to access text messages that have already been received by the intended recipient and remain in storage is not the question before us today. We decline to find there was no interception here based on the fact that the messages were in electronic storage when they reached the phone—a technicality that has no relevance under our state statute.

CONCLUSION

When the detective intercepted Roden's text messages to Lee, officers had already booked Lee into jail, and the State does not argue that exigent circumstances required a warrantless search of the phone. There is simply no evidence that there was insufficient time for law enforcement officials to seek a court order. We find that the privacy act was violated because the detective intercepted Roden's private communications without Lee's or Roden's consent and without a court order. We reverse the Court of Appeals and reverse Roden's conviction without prejudice.

*González, J.*

WE CONCUR:

_____

_____

Fairhurst, J.

_____

No. 87669-0

WIGGINS, J. (dissenting)—The majority holds that Detective Kevin Sawyer violated Washington's privacy act, chapter 9.73 RCW, when he intercepted text message communications without Daniel Lee's or Jonathan Roden's consent. I respectfully disagree. I would find that there was no interception because the text messages reached their intended destination without interruption.

At issue here is whether Detective Sawyer used a device to "intercept" a private communication when he perused the stored contents of Lee's iPhone and responded to stored and incoming text messages. Resolution of this issue depends on statutory construction. The term "intercept" in RCW 9.73.030 is subject to two reasonable interpretations: a strict construction that focuses on whether the communication was acquired during transmission, and a liberal construction that focuses on whether the communication was acquired prior to the intended recipient's cognitive receipt of the communication. Because this is a criminal statute, I would adopt the strict construction. In other words, I would find that an intercept must occur during transmission. Once a communication has arrived at its intended destination, it is no longer subject to interception. This interpretation gives effect to the legislature's intent at the time section .030 was enacted and the plain language of the statute.

## ANALYSIS

Washington's privacy statute provides, in pertinent part:

(1)     Except as otherwise provided in this chapter, it shall be unlawful for any individual, partnership, corporation, association, or the state of

Washington, its agencies, and political subdivisions to intercept, or record any:

(a) Private communication transmitted by telephone, telegraph, radio, or other device between two or more individuals between points within or without the state by any device electronic or otherwise designed to record and/or transmit said communication regardless how such device is powered or actuated, without first obtaining the consent of all the participants in the communication.

RCW 9.73.030. By its terms, section .030 prohibits the use of any device to intercept or record any private communication without the prior consent of all participants. There are statutory exceptions to this prohibition, although none are at issue in the current case.[1] Thus, I confine my analysis to an interpretation of section .030.

I.   Rules of statutory interpretation

Our fundamental objective in construing a statute is to ascertain and carry out the legislature's intent. *State v. Sweany,* 174 Wn.2d 909, 914, 281 P.3d 305 (2012); *State v. J.P.,* 149 Wn.2d 444, 450, 69 P.3d 318 (2003). When possible, the court derives legislative intent solely from the plain language enacted by the legislature, considering the text of the provision in question, related provisions, and the statutory scheme as a whole. *State v. Ervin,* 169 Wn.2d 815, 820, 239 P.3d 354 (2010); *Dep't of Ecology v. Campbell & Gwinn, LLC,* 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). Where statutory language is unambiguous, we give effect to the ordinary meaning of the words in the statute. *J.P.,* 149 Wn.2d at 450.

---

[1] This case potentially implicates RCW 9.73.090(2) and RCW 9.73.230(1), provisions that specifically allow law enforcement officers to intercept and record private conversations concerning controlled substances under certain circumstances. But because the parties do not brief these issues, I will not address them.

2

Our focus in the current case is the meaning of "intercept" within the context and purpose of RCW 9.73.030. There are numerous rules of statutory construction, but of particular relevance here are: (1) we should adopt the interpretation that best advances the perceived legislative purpose and (2) criminal statutes must be strictly construed. *Bennett v. Hardy*, 113 Wn.2d 912, 928, 784 P.2d 1258 (1990); *State v. Clark*, 96 Wn.2d 686, 690, 638 P.2d 572 (1982).

II.  A strict interpretation best advances the legislature's intent at the time the provision was enacted

Our challenge in this case is to interpret a statute adopted almost 50 years ago and apply it to electronic communications devices not anticipated when the statute was passed.[2] To do this, we examine the purpose of the statute, taking into account the historical background at the time it was enacted. *State v. A.N.W. Seed Corp.*, 116 Wn.2d 39, 45, 802 P.2d 1353 (1991).

A review of the political, social, and legal atmosphere in 1967 supports the interpretation that interception occurs only during transmission of the message. When our legislature enacted section .030, the nation was concerned with increasing use of electronic eavesdropping, wiretapping, and informers wired to record private communications. Thus, it appears that our legislature enacted section .030 to limit the circumstances under which electronic eavesdropping and

---

[2] Today, many, if not most, Americans use text messages to communicate with each other. Yet when it comes to protecting the privacy of these messages, courts struggle to apply outdated statutes to the realities of this new technology. I share the concern of the First, Ninth, and Eleventh Circuits about the judicial interpretation of a statute written prior to the widespread usage of a technology in a case involving purported interceptions of a communication using that technology. *See In re Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9, 21 (1st Cir. 2003); *United States v. Steiger*, 318 F.3d 1039, 1047 (11th Cir. 2003); *Konop v. Haw. Airlines, Inc.*, 302 F.3d 868, 874 (9th Cir. 2002).

3

wiretapping would be permitted. "Electronic eavesdropping" refers to the "use of hidden microphones, recorders, and any other mechanical or electronic means of *ongoing capturing* communications, other than wiretapping (tapping into telephone conversations)." GINA STEVENS & CHARLES DOYLE, CONGRESSIONAL RESEARCH SERV., PRIVACY: AN OVERVIEW OF FEDERAL STATUTES GOVERNING WIRETAPPING AND ELECTRONIC EAVESDROPPING CRS-1 n. 1 (2003) (emphasis added). Accordingly, "interception," as it is used in the statute, almost certainly refers to the use of a device to listen to or capture communications during transmission.

Prior to enactment of section .030, no law prevented a Washington citizen or public officer from using electronic equipment to eavesdrop. *See* 1 HOUSE JOURNAL, 40th Leg., Reg. Sess., at 2031 (Wash. 1967).[3] The only statutory prohibition against eavesdropping was a 30-year-old section in the federal Communications Act of 1934 that had been interpreted by courts to proscribe wiretapping. 47 U.S.C. § 605(a) ("[n]o person not being authorized by the sender shall intercept any . . . communication [by wire] and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person").[4] But,

---

[3] The House Journal reports that Representative Backstrom asked, "I have continuously offered my objections because of eavesdropping. Do we have it clear that this bill precludes eavesdropping?" Representative Heavey responded, "Right now we have no laws that prevent eavesdropping. Somebody can eavesdrop if they have the equipment to do it. This law prevents them from doing it, but it does permit, in rare instances with court approval, the prosecuting attorney or attorney general to eavesdrop or tap lines. I also want to point out that this in no way circumvents the federal laws of wiretapping because they take precedence over our laws." HOUSE JOURNAL at 2031.

[4] The issue of wiretapping reached the United States Supreme Court in *Olmstead v. United States*, 277 U.S. 438, 48 S. Ct. 564, 72 L. Ed. 944 (1928), *overruled in part by Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). Olmstead was a Seattle bootlegger whose Prohibition Act conviction was the product of a federal wiretap.

4

section .605 did not ban the use of electronic devices to surreptitiously record and transmit private conversations, and it applied only in federal court proceedings. *Schwartz v. Texas*, 344 U.S. 199, 73 S. Ct. 232, 97 L. Ed. 231 (1952) (section .605, which bars admission of evidence obtained by means of wiretapping and intercepting telephone messages, does not apply to state court proceedings); *accord State v. Jennen*, 58 Wn.2d 171, 173, 361 P.2d 739 (1961).

One year before our legislature enacted RCW 9.73.030, the United States Supreme Court held that the Fourth Amendment to the United States Constitution does not protect against undercover agent interceptions or recordings of private communications. *See Lewis v. United States*, 385 U.S. 206, 87 S. Ct. 424, 17 L. Ed. 2d 312 (1966) (evidence obtained by recording device hidden on informant who went to defendant's home to purchase marijuana admissible); *Hoffa v. United States*, 385 U.S. 293, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966) (defendant who allows confidential government informant into hotel suite cannot claim Fourth Amendment

---

By a five-to-four vote, the Court held that the tapping was not a search or seizure in violation of the Fourth Amendment as there was no seizure of anything tangible and there was no entry on the premises of the defendants. *Id.* at 466. Chief Justice William H. Taft, writing for the majority, pointed out that Congress was free to provide protection, which the Constitution did not. *Id.* at 465. In the post-*Olmstead* period, there were at least seven bills aimed at limiting the use of wiretapping introduced in Congress. H.R. 4139, 71st Cong., 1st Sess. (1929); H.R. 5416, 71st Cong., 1st Sess. (1929); S. 6061, 71st Cong., 3d Sess. (1931); H.R. 23, 72d Cong. 1st Sess. (1932); H.R. 5305 72d Cong., 1st Sess. (1932); H.R. 9893, 72d Cong., 1st Sess. (1932); S. 1396, 72d Cong., 1st Sess. (1932); Robert Baronsky, *Recent Federal Case*, 36 WASH. L. REV. 93, 95 (1961). None passed. In 1934, Congress passed the federal Communications Act, which expanded the Radio Act of 1927's proscription against intercepting and divulging radio communications so as to include intercepting and divulging radio or wire communications. *See* 47 U.S.C. § 605. The federal Communications Act neither expressly condemned law enforcement interceptions nor called for the exclusion of wiretap evidence, but it was interpreted by courts to encompass both. *Nardone v. United States*, 302 U.S. 379, 58 S. Ct. 275, 82 L. Ed. 314 (1937); *Weiss v. United States*, 308 U.S. 321, 60 S. Ct. 269, 84 L. Ed. 298 (1939).

protection); *Osborn v. United States*, 385 U.S. 323, 87 S. Ct. 429, 17 L. Ed. 2d 394 (1966) (evidence obtained from recording device placed on police informant who applied for job admissible). The Court explained that the Fourth Amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa*, 385 U.S. at 302. Scholars at the time commented on the breadth of these decisions, pointing out that almost any secret-agent tactic could be justified under the opinions' open-ended reasoning. Note, *Judicial Control of Secret Agents*, 76 YALE L.J. 994, 996 (1967) (writing that the decisions and rationale in *Hoffa*, *Osborn*, and *Lewis* imposed no limitations whatever on the use of police spies).

Simultaneously, practitioners, scholars, and policy makers vigorously debated the use of wiretapping, eavesdropping, and informers wired to record conversations. *See* Comment, *Eavesdropping Orders and the Fourth Amendment*, 66 COLUM. L. REV. 355, 355 (1966). On the one side, the practice was condemned as "'dirty business'" and a harbinger of a police state. *Id.* On the other, it was seen an effective law enforcement tool. *See* Michael J. Murphy, *Judicial Review of Police Methods in Law Enforcement, The Problem of Compliance by Police Departments*, 44 TEX. L. REV. 939, 946 (1966) (New York city police commissioner during the 1960s states that wiretapping is one of the most effective weapons in the arsenal of law enforcement). Columbia Law Professor Alan Westin wrote in 1966:

> The problem that cries out for legislation most acutely is that of wiretapping, electronic eavesdropping, and optical surveillance. At the moment, the chaotic state of existing federal and state laws and the continued legislative inaction in this area have led to public concern whether law can ever come to grips with the problem. There has been

no congressional action since the passage of the Communications Act of 1934, and less than a dozen states have passed modern statutes attempting to deal with the use of physical surveillance technology.

Alan F. Westin, *Science, Privacy, and Freedom: Issues and Proposals for the 1970's, Part II: Balancing the Conflicting Demands of Privacy, Disclosure, and Surveillance*, 66 COLUM. L. REV. 1205, 1223 (1966) (footnotes omitted).

In this context, the Washington State Legislature enacted RCW 9.73.030-.080. One year later, Congress passed the wiretap act (18 U.S.C. §§ 2510-2522, commonly referred to as Title III of the Omnibus Crime Control and Safe Streets Act of 1968) in response to congressional investigations and published studies finding that government agents and private individuals were wiretapping without the consent of the parties or legal sanction.

In summary, at the time section .030 was enacted, the country was concerned with electronic eavesdropping and wiretapping. Listening devices were becoming more available to all persons at nominal costs. Lester B. Orfield, *Wiretapping in Federal Criminal Cases*, 42 TEX. L. REV. 983 (1964); *see also* Westin, *supra* (development and adoption of devices have enormously expanded the capacity of public and private authorities to place the individual under surveillance). Our state legislature was similarly concerned. *See* HOUSE JOURNAL at 2031.

Accordingly, "intercept" in our statute most likely refers to wiretapping and eavesdropping activities—that is, any attempt by means of any contrivance to listen to or obtain the contents of a private communication while parties are communicating. *See, e.g., State v. Cory*, 62 Wn.2d 371, 372, 382 P.2d 1019 (1963) (conversations between defendant and attorney were eavesdropped on through

7

microphone installed in conference room); *State v. Drew*, 70 Wn.2d 793, 425 P.2d 349 (1967) (officers placed defendant and third person together in cell with hidden microphone, and through use of microphone, police learned that defendant claimed to know location of body; *see also* Note, *Congressional Wiretapping Policy Overdue*, 2 STAN. L. REV. 744, 761 (1950) (suggesting that "wiretapping" be defined to include any attempt by means of any device to listen to the contents of a telephone message while the parties are talking).

It bears mentioning that there is no indication that our legislature was concerned with surreptitious access to stored communications. Indeed, the technology to store communications on mobile devices was largely nonexistent in 1967, making it highly unlikely, if not impossible, that the legislature could have been referring to the acquisition of electronic communications after the messages had been received and stored. Likewise, there is no indication that the legislature intended to protect an intended recipient's ability to access a communication. To reiterate, the statute was intended to prohibit electronic eavesdropping, where the eavesdropper overhears an ongoing communication, regardless of whether the intended recipient receives the communication. Accordingly, "intercept" most likely refers to acquisition of a communication during transmission.

III. A strict interpretation comports with the plain meaning of "intercept" and makes clear what conduct is criminal

The majority adopts a liberal interpretation of "intercept." It apparently reads "before arrival" broadly as meaning "before the intended recipient accesses the communication." Because this is a criminal statute, I would adopt a strict

8

construction. That is, I would read "before arrival" as meaning simply "before a message reaches its intended destination," thereby providing clarity as to what actions constitute an unlawful intercept. *See State v. Bell*, 83 Wn.2d 383, 388, 518 P.2d 696 (1974) (in criminal cases, fairness dictates that statutes should be literally and strictly construed; courts should refrain from using possible but strained interpretations).

The statute does not define "intercept." A nontechnical term left undefined in a statute is given its plain and ordinary meaning, as defined in a standard dictionary.[5] *State v. Sullivan*, 143 Wn.2d 162, 174-75, 19 P.3d 1012 (2001); *State v. Athan*, 160 Wn.2d 354, 369, 158 P.3d 27 (2007). Thus, as the majority notes, "intercept" means to "stop . . . before arrival . . . or interrupt the progress or course." Majority at 11 (alterations in original) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1176 (2002)).

In other words, an interception must occur "before arrival" or before a message has reached the end of its journey. The intercepting act must interrupt a message's course or progress, meaning it must halt or interfere with a message while the message is moving, proceeding, or advancing from one point to another. After a message has arrived at its intended destination, there can be no interception. This is a strict construction of the statute.

---

[5] "Intercept" in RCW 9.73.030 is likely a technical term. Because technical terms are not readily susceptible to dictionary definitions, I do not agree that it is appropriate to discern the meaning of a technical term by referencing its dictionary definition. *See Tingey v. Haisch*, 159 Wn.2d 652, 658, 152 P.3d 1020 (2008) (when technical term used, term should be given its technical meaning rather than general dictionary meaning). But even adopting the dictionary definition, the majority's interpretation is incorrect.

By requiring that the intended recipient read or hear the message, the majority reads into the statute requirements that do not exist. *Rest. Dev., Inc. v. Cananwill, Inc.*, 150 Wn.2d 674, 682, 80 P.3d 598 (2003) ("court must not add words where the legislature has chosen not to include them"). There are also practical difficulties inherent in focusing on the intended recipient's cognitive receipt. There is no assurance that a recipient will ever open and read a message. Some missives are discarded immediately upon receipt, some left unopened indefinitely, and some arrive in an indiscernible or corrupted condition. It is also possible that a recipient will receive a message but be unable to understand, read, or hear the message due to language barriers, or physical or mental disability. Thus, section .030's prohibition against intercepting and recording understandably focuses on a defendant's actions, as opposed to outcomes that may be outside a defendant's control.

To make clear what conduct is criminal, I would interpret the statute strictly to prohibit the acquisition or diversion of communications during transmission. Notably, this case arises under Title 9 RCW, titled "Crimes and Punishments." Any person who intercepts, records, or divulges private communications without the consent of the communicating parties is guilty of a misdemeanor. *See* RCW 9.73.030, .080. The majority would hold that Detective Sawyer is guilty of a misdemeanor for reading and responding to the text messages. I cannot agree.

Indeed, adopting the majority's reasoning, any passerby who happens upon a lost or misplaced cell phone violates the privacy act if, during the time he or she possesses the phone, the phone receives a text and the possessor happens to see the incoming message. And hapless is the concerned citizen who proactively sends

10

a message to a stored contact in an effort to return the phone to its rightful owner, for he or she has almost certainly committed a misdemeanor. *See* RCW 9.73.080; *see also City of Seattle v. Fuller*, 177 Wn.2d 263, 270, 300 P.3d 340 (2013) (constructions that yield unlikely, absurd, or strained consequences must be avoided).

The majority's broad interpretation would reach activity that is not clearly covered by the statute. I would not expect an ordinary citizen to read "intercept" as including the act of acquiring a communication after it has reached its intended destination. "Criminal statutes must be construed in the manner in which an ordinary citizen would understand their terms." *State v. Johnson*, __ Wn.2d __, 315 P.3d 1090, 1104 (2014) (Wiggins, J., dissenting); *State v. Shipp*, 93 Wn.2d 510, 515-16, 610 P.2d 1322 (1980) (citing *Winters v. New York*, 333 U.S. 507, 515, 68 S. Ct. 665, 92 L. Ed. 840 (1947)); *City of Seattle v. Pullman*, 82 Wn.2d 794, 797, 514 P.2d 1059 (1973). We should not hold persons criminally liable where it is not clear what is forbidden; we cannot require citizens to puzzle out the meaning of obscure language in a statute. Thus, I would adopt a strict interpretation of the statute and require that the interception occur before arrival, during transmission.[6]

---

[6] The federal electronic communications privacy act defines "intercept" as the "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). Like our statute, this definition does not explicitly require that an intercept occur during transmission. However, federal courts have interpreted the term "intercept" to mean any acquisition of a communication "'contemporaneous with transmission.'" *Theofel v. Farey-Jones*, 359 F.3d 1066, 1077-78 (9th Cir. 2004) (no interception when defendant gained unauthorized access to plaintiff's e-mails, which were already delivered and stored electronically) (quoting *Konop*, 302 F.3d at 878 (fraudulent access to stored communication does not constitute an "interception"; interception requires access contemporaneous with transmission); *Steve Jackson Games, Inc. v. U.S. Secret Serv.*, 36 F.3d 457, 461-62 & n.7 (5th Cir. 1994)

IV.    Related provisions support a strict interpretation

Other provisions of chapter 9.73 RCW indicate that the legislature did not intend to criminalize accessing an electronic communication after it had reached its intended destination.    RCW 9.73.020, which by its terms also applies after a communication has reached its destination, prohibits opening "any sealed message, letter or telegram intended for another person . . . ."    But, the legislature clearly intended this provision to apply to tangible documents, as opposed to electronic communications.    This provision was enacted in 1909, long before the advent of text message technology.    Moreover, section .020 refers to letters and telegrams, which are tangible objects, not digitally stored and displayed missives.    When the legislature acted to protect private electronic communications, it adopted entirely different language, prohibiting recording and intercepting, instead of prohibiting opening sealed messages.    RCW 9.73.030.    Thus, I find the majority's letter analogy unconvincing and would instead construe section .030 as prohibiting the acquisition of private communications during transmission.

---

(Congress did not intend for "interception" to apply to e-mail stored on an electronic bulletin board); *United States v. Meriwether*, 917 F.2d 955, 959-60 (6th Cir. 1990) (access to stored information through the use of another's pager does not constitute an "interception"); *United States v. Reyes*, 922 F. Supp. 818, 836-37 (S.D.N.Y. 1996) (same); *Wesley Coll. v. Pitts*, 974 F. Supp. 375, 385 (D. Del. 1997) (no "interception" occurs when the contents of electronic communications are acquired unless contemporaneous with their transmission); *Cardinal Health 414, Inc. v. Adams*, 582 F. Supp. 2d 967, 979-81 (M.D. Tenn. 2008) (same); *see also Adams v. City of Battle Creek*, 250 F.3d 980, 982 (6th Cir. 2001) (use of a "'clone'" or duplicate pager to simultaneously receive the same message as a target pager is an "interception"); *Brown v. Waddell*, 50 F.3d 285, 294 (4th Cir. 1995) (same).

CONCLUSION

I would strictly construe section .030 and find that there was no interception because the detective viewed and responded to text messages after the texts had arrived at their intended destination—the iPhone. This interpretation of "intercept" considers the purpose of the statute, the plain language enacted by the legislature, related provisions, and the statutory scheme as a whole at the time it was enacted. To conclude, I find no violation of Washington's privacy act. And, I would find no violation of state or federal constitutional provisions because Roden lacks standing to challenge the alleged search of Lee's iPhone. *See State v. Hinton*, No. 87663-1 (Wash. Feb. 27, 2014) (J.M. Johnson, J., dissenting). Thus, I would affirm Roden's conviction.

13

For these reasons, I dissent.

_Wiggins, J._

_Owens, J._

_Madsen C.J._

_J.M. Johnson_

14