IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 35843-7-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DAVID RAMOS, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — David Ramos was charged with five violent crimes committed against his sister-in-law, and later with violating a protection order. He appeals his convictions on all counts. We affirm the convictions but agree that a ministerial correction to his judgment and sentence is required. We also grant relief from two fees imposed by the trial court, subject to the State's opportunity to present evidence that they remain mandatory for Mr. Ramos.

FACTS AND PROCEDURAL BACKGROUND

On a late afternoon in December 2015, a couple noticed the lights of an unknown car back into the driveway of their home on Gordon Avenue in Spokane. When the car was still there after about 10 minutes, the husband stepped outside to investigate and saw

a man, who later proved to be David Ramos, trying to push a woman into the car's trunk. She was kicking and calling for help. As the wife called 911, the husband yelled that he had called the cops and they were on their way. Mr. Ramos succeeded in closing the trunk on the woman, got into the car, and sped away. The couple obtained an incomplete license plate number for the car, which they provided to police.

By that evening, Detective Corey Turman had been able to determine that the car seen in the Gordon Avenue driveway was registered to a married couple, who we will refer to as R.M. and E.M. The detective had also obtained a cell phone number for E.M. and persuaded her to meet him in the parking lot of a restaurant so that he could confirm that she was all right. E.M. would later testify that while she agreed to meet the detective, she did not want to speak with him and tried to avoid answering his questions. She had fully buttoned her coat and pulled its hood over her head, trying to hide injuries that Mr. Ramos had inflicted on her earlier that day.

E.M. had a relationship with David Ramos that had been violent in the past and was in a crisis mode on the day he was seen pushing her into the trunk of her car. Mr. Ramos worked for E.M. at a fast food restaurant, and in the spring of 2015, the two of them began having an affair. While engaged in the affair, Mr. Ramos became her brother-in-law, having met and married E.M.'s sister. On the day she was pushed into the trunk (and was assaulted and terrorized in other ways), E.M.'s husband, R.M., from whom she was separated, had encountered Mr. Ramos at her home. E.M. and R.M.

2

argued, and R.M. later called her to say he wanted a divorce.  During the time Mr. Ramos

was parked with E.M. in the Gordon Avenue driveway, he was angry and crying because

his wife, who was pregnant, had left him.

E.M. showed up to speak with Detective Turman.  But when it became apparent

that E.M. was unwilling to tell him what had happened earlier in the day, the detective

told her that he was going to take her phone.  He later testified to what he had said to her:

> I explained to her that I was taking her phone, because it was apparent that
> she was not going to try to protect herself, and if she was not going to try to
> protect herself, I was going to do everything I could to protect her.  She
> indicated that she wanted to leave.  I told her that she was—she could leave
> but she's not leaving with that cell phone, because I believed that there was
> a potential that she could be murdered, and if she was not going to protect
> herself, that cell phone may have evidence in it that can help me solve a
> future murder.

Report of Proceedings (RP)[1] at 1137.

After that, E.M. agreed to travel to the police station with the detective.  She still

refused to submit to an interview, but relented when it was agreed that the interview

would not be recorded.  She would later testify that on that first night, she told the

detective only some of the harm that Mr. Ramos had inflicted on her that day.  Following

the interview, at around 10:00 p.m., E.M. traveled to a hospital emergency room with her

mother and husband, where she was examined and her injuries were photographed.

---

[1] All references are to the verbatim report of proceedings designated as Volume 1,
which begins with proceedings on December 11, 2015, and contains the trial and
sentencing hearing.

At the hospital, E.M. reported having been hit by Mr. Ramos with his fists and elbows, and having been kicked. She reported that Mr. Ramos had bitten her and sexually assaulted her in various ways. She reported that a knife was used in the assault and that she had been choked multiple times. She said that at one point, Mr. Ramos tried to take her wedding ring; when she clenched her fingers to prevent it, he bit her wrist hard and when she released her fingers, he ripped off her ring. She reported that Mr. Ramos had threatened she would never see her son again, and she was afraid she was going to die.

The emergency room nurse would later testify that in examining E.M., she observed multiple bite marks, two black eyes, bruising around her neck consistent with being choked, and large bruises all over her body. The nurse saw E.M. a few days later when E.M. returned to the hospital complaining of a headache, drainage from her ears, and "a muffled sound." RP at 1047. She was found to have ruptured eardrums in both ears, which the examining nurse testified was consistent with her allegation that she had been hit and kicked in the side of the head.

Law enforcement located and arrested Mr. Ramos at around midnight on the night of the assaults. During a search of his person they recovered two steak knives, and a search of Mr. Ramos's bedroom at his mother's home produced evidence corroborating some of E.M.'s statements about the sexual assaults. At the jail, staff observed Mr. Ramos put something in his mouth and swallow; thinking Mr. Ramos had swallowed

4

drugs, he was transported to the hospital. Mr. Ramos disclosed that he had swallowed a ring, and following his return to jail, E.M.'s wedding ring was recovered from one of his bowel movements.

Two days following her initial interview, E.M. returned for a recorded interview with Detective Turman, ultimately recounting an afternoon and evening of repeated physical and sexual assaults at the hands of Mr. Ramos. Mr. Ramos's brutalization of E.M. had taken place in her car, at a park, and at Mr. Ramos's mother's home. The details are not important to the issues on appeal.

The State initially charged Mr. Ramos with first degree robbery, first degree kidnapping, and second degree rape. It later amended the information to include charges of first degree rape, second degree assault, and violation of a domestic violence protection order.[2] Four of the counts were charged as domestic violence offenses.

Before trial, motions in limine filed by the State included a motion that E.M. be allowed to testify about prior domestic violence by Mr. Ramos. Defense counsel told the court that he and Mr. Ramos did not object to the testimony. At trial, E.M. testified that

---

[2] In December 2015, a no-contact order was issued that prohibited Mr. Ramos from contacting E.M. His calls and letters to her resulted in the protection order violation charge. For a time, E.M. continued to have contact with Mr. Ramos while in jail, explaining at trial that she missed him and still loved him. She eventually cut off communication in June 2016.

Mr. Ramos had hit her, kicked her, threatened her, and taken her car before December 2015, but she did not testify to any dates or places.

The jury found Mr. Ramos guilty as charged. A domestic violence special verdict form asking if Mr. Ramos was in a dating relationship with E.M. on the date of the crimes was left blank, which jurors had been told to do if they could not unanimously agree on "yes" or "no." Nevertheless, the judgment and sentence was completed to indicate that for five counts, domestic violence had been pleaded and proved.

Mr. Ramos was sentenced to a period of total confinement of 374 months. He appeals.

## ANALYSIS

Mr. Ramos contends on appeal that he received ineffective assistance of counsel when his trial lawyer consented to the admission of E.M.'s testimony about prior abuse and failed to object to evidence obtained from E.M.'s cell phone, and that the trial court erred when it entered a judgment stating that domestic violence was pleaded and proved. In supplemental briefing, he argues that criminal filing and DNA[3] collection fees should be struck from his judgment and sentence in light of the Washington Supreme Court's decision in *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018).

---

[3] Deoxyribonucleic acid.

6

I.     INEFFECTIVE ASSISTANCE OF COUNSEL IS NOT DEMONSTRATED

     A.     Failure to object to evidence of prior domestic violence

Among the State's motions in limine was a motion asking the trial court, in part, to

"allow [E.M.] to testify regarding the prior domestic violence between her and the

defendant." Clerk's Papers (CP) at 74. At the hearing on the motions, Mr. Ramos's

lawyer had this to say about that motion:

> Now, I am already agreeing that the victim's comments that he—my
> client has been abusive in the past. We're not objecting to that. That's
> fine. And I'm not making an objection. We've thought and talked about it.
> So, if she wants to testify that he's been abusive with her throughout the
> course of the relationship, we actually are fine with that coming in.

RP at 312. Mr. Ramos argues on appeal that the circumstances did not support admitting

evidence of prior domestic violence, and it was ineffective assistance to consent to its

admission.

The State responds that the consent to admitting the evidence was tactical because

the defense theory was that after E.M.'s and her sister's marriages were destroyed by the

affair, E.M. sought to minimize her own responsibility—and fabricating a history of

domestic violence by Mr. Ramos was a way to do that.

To demonstrate ineffective assistance of counsel, a defendant must show that his

lawyer's representation was deficient and the deficient representation prejudiced the

defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d

674 (1984). Representation is deficient if it falls "below an objective standard of

7

reasonableness based on consideration of all the circumstances." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Prejudice occurs when but for "counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 335. If a party fails to satisfy either element, the reviewing court need not consider both prongs. *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726 (2007).

"Judicial scrutiny of counsel's performance must be highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955)). Tactical decisions cannot form the basis for a claim of ineffective assistance of counsel. *McFarland*, 127 Wn.2d at 336.

The State's contention that consent to admission of the evidence was tactical is supported by the record. As previously noted, Mr. Ramos's lawyer stated that he and his client had thought about whether to object to the evidence and were "fine" with it coming in. The State's characterization of the defense theory is supported by defense counsel's cross-examination of E.M. After establishing that E.M. had never earlier reported domestic violence to police, he engaged in the following examination:

Q. Did you fabricate this sexual assault story in order to demonize him and make—sort of downplay your own behavior after everything blew up?

A. No.

Q. I mean, stating this to the police, that all of these horrible things occurred, would you agree it sort of makes it a little easier when you talk to your mom about the mistake you made by having an affair with your sister's husband?

A. Did it make it easier?

Q. Would you agree?

A. No.

Q. I mean, isn't it sort of easier for your family to accept you back if you—you demonize Mr. Ramos and say all of these things and you were always under his spell and it really wasn't your fault?

A. No.

Q. That you were always a victim of his abuse and you could never get away with it?

A. No.

RP at 1004. In closing argument, defense counsel argued that E.M. fabricated events, emphasizing that she had made no timely report of any earlier abuse. Because it is plausible that consent to admission of the evidence was tactical and we presume effective representation, Mr. Ramos does not demonstrate ineffective assistance of counsel.

B. Failing to object to "seizure" of E.M.'s telephone

Mr. Ramos also contends that his trial lawyer was ineffective for failing to object to the admission of evidence obtained from E.M.'s telephone, which he argues was obtained in violation of RCW 9.73.030, a provision of Washington's privacy act, and the Fourth Amendment to the United States Constitution.

RCW 9.73.030(1) provides:

9

> [I]t shall be unlawful for . . . the state of Washington, its agencies, and political subdivisions to intercept, or record any:
>
> (a)  Private communication transmitted by telephone, telegraph, radio, or other device between two or more individuals between points within or without the state by any device electronic or otherwise designed to record and/or transmit said communication regardless how such device is powered or actuated, without first obtaining the consent of all the participants in the communication.

Evidence obtained in violation of the privacy act is inadmissible for any purpose at trial. *State v. Roden*, 179 Wn.2d 893, 898-99, 321 P.3d 1183 (2014) (citing RCW 9.73.050).

Mr. Ramos's argument of this assigned error is scattershot. To begin with, it is devoid of any description or citation to the record identifying the specific evidence he contends was objectionable. We could reject the assignment of error on that basis alone.

At one point he argues that for Detective Turman to tell E.M. he was taking her cell phone was an unconstitutional seizure of E.M., in violation of the Fourth Amendment. But attempts by a criminal defendant to vicariously assert violations of the Fourth Amendment rights of others have been "repeatedly rejected" by the United States Supreme Court. *United States v. Salvucci*, 448 U.S. 83, 86, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980).

Elsewhere, he likens his case to *Roden*, but in that case—construing the state privacy act—the Washington State Supreme Court recognized that looking at text messages recorded on a cell phone obtained by law enforcement does not present a *recording* violation. 179 Wn.2d at 903-04 (citing *State v. Townsend*, 147 Wn.2d 666,

10

678-79, 57 P.3d 255 (2002)).  Text messages are inherently recorded and their recording is something to which the sender of a message impliedly consents.  *Id.* A person in lawful possession of a recorded text message no more violates the privacy act by testifying to the substance of the recording than a party to a conversation would violate the privacy act by testifying to its substance.  Because Mr. Ramos never brought a suppression motion, we have no basis for believing that law enforcement's review of E.M.'s cell phone was not lawfully based on her consent or the procurement of a search warrant.  *Cf. State v. D.E.D.*, 200 Wn. App. 484, 490-91, 402 P.3d 851 (2017) (Where there is no motion to suppress, the State has no obligation or interest in developing the factual basis for its actions.).

In *Roden*, police officers did not violate the privacy act by looking at recorded messages already on Roden's phone; they violated the act by *intercepting* messages.  As explained by the Supreme Court, by pretending to be Roden and receiving text communications intended for him, they "'stop[ped] . . . before arrival . . . or interrupt[ed] the progress or course'" of messages intended for Roden.  179 Wn.2d at 904 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1176 (2002)).  That is not what happened in this case.

Mr. Ramos cannot demonstrate that an effort by his trial lawyer to suppress evidence obtained from E.M.'s cell phone had any prospect for success.  Because he does

11

not demonstrate deficient performance, we need not address whether he can demonstrate

prejudice.

II.     ERRONEOUS FINDING THAT DOMESTIC VIOLENCE WAS PLEADED AND PROVED

Mr. Ramos next argues the trial court erred when it entered a judgment and

sentence stating that domestic violence was pleaded and proved on five of six counts.

The State concedes error because the jury did not complete a special verdict finding that

domestic violence had been proved on any count.[4]  The only point of contention on

appeal is whether the error in the judgment and sentence requires resentencing or only a

ministerial correction.

A finding that a crime was committed by "one family or household member

against another" is a basis for designating it a domestic violence crime.  *See*

RCW 10.99.020(3)-(5).  The designation has consequences for a defendant's

offender score, should he or she commit domestic violence crimes in the future.  *See*

RCW 9.94A.525(21).  Yet, as the State points out, "there is no evidence the trial court

added points to [Mr. Ramos's] offender scores based upon the domestic violence

---

[4] As an issue under this assignment of error, Mr. Ramos points out that while the amended information included domestic violence allegations for only four of the six counts, the jury instructions and special verdict form stated that five counts had included domestic violence allegations. While Mr. Ramos is correct, this error was rendered moot by the fact that the jury did not return any domestic violence findings.

designation" and Mr. Ramos "does not assign error to the court's offender score

calculation." Br. of Resp't at 31.[5] Mr. Ramos has not challenged that point.

While the statutory consequences of the finding had no effect on Mr. Ramos's

offender score, he argues that the State relied on the domestic violence finding in asking

the court to impose the high end of the standard range. The State's argument for

imposing the high end of the sentence range relied foremost on Mr. Ramos's extensive

juvenile and adult history of assault, vehicular assault, and protective order violations,

with the prosecutor telling the court, "[T]his is an individual who has one reaction to him

being unsatisfied with what's going on in his life and that's to assault others." RP at

1372. She reminded the court that the presentence investigator reported that the

defendant "in her words, was once again before the court on a vicious crime against a

person." *Id.* The prosecutor did conclude by saying,

> No person should certainly suffer the kind of abuse, humiliation and
> terror [E.M.] did. *And this is also a crime, Your Honor, where the jury
> found there was a domestic violence situation*, and we would argue that that
> in and of itself with the history and the fact this was intimate-partner
> violence certainly warrants the high end.

RP at 1373 (emphasis added).

Mr. Ramos conceded throughout closing argument that E.M. and he were

intimately involved, so if the trial court attached importance to "the fact [that] this was

---

[5] The State also points out that without any enhancement for the erroneous finding in the judgment and sentence, Mr. Ramos's offender scores for all but his most serious violent offense (which counts as 0) were 14 or 15. Br. of Resp't at 33; CP at 193.

intimate-partner violence," it had a basis for doing so with or without a jury finding of a dating relationship. More importantly, the court stated reasons for imposing the high end of the standard range, and they did not include a belief that the jury found a dating relationship. Instead, the court relied on the presentence investigation, which it told Mr. Ramos revealed "an entirely different side of you that I didn't see," and the fact that Mr. Ramos did not apologize to E.M., which "cause[d] the court concern about where you're headed and what you will do." RP at 1389. It also alluded to Mr. Ramos's "lack of cooperation or refusal, as [defense counsel] voiced it, here this morning." *Id.* Defense counsel had told the court that morning that Mr. Ramos refused to provide information requested for the presentence investigation and, while the lawyer would ordinarily have a statement "regarding perhaps remorse to deliver to the court and the parties . . . [t]hat is not going to be occurring today." RP at 1365.

When a sentencing court places significant weight on an inappropriate factor, a remand for resentencing is required, but it is not required if we are able to conclude that the trial judge would still impose the same sentence even if considering only valid reasons. *State v. DeMara*, 62 Wn. App. 23, 30, 812 P.2d 898 (1991). In this case, the trial court does not appear to have placed any weight on the prosecutor's erroneous statement that the jury found a dating relationship. Resentencing is not required.

14

III.     CRIMINAL FILING AND DNA COLLECTION FEES

In a supplemental brief, Mr. Ramos asks us to order the trial court to strike the

$200 criminal filing fee and $100 DNA fee imposed at sentencing based on *Ramirez*,

which held that a legislative overhaul of Washington's legal financial obligations

provisions that became effective in June 2018 applies to cases then on direct review.

191 Wn.2d at 747.  The 2018 changes provide in part that the criminal filing fee cannot

be imposed against a defendant who is indigent as defined in RCW 10.101.010(3)(a)-(c)

at the time of sentencing.  RCW 10.01.160(3).  The amendments prohibit the assessment

of a DNA collection fee if the State has previously collected the defendant's DNA as a

result of a prior conviction.  RCW 43.43.7541.

The record reveals that Mr. Ramos was found indigent for purposes of

appointment of counsel at trial and on appeal, but it does not establish that he was

indigent as defined by RCW 10.101.010(3)(a)-(c).  It also establishes that he has had

felony convictions since 2002, when legislation was passed requiring the taking of a

DNA sample upon a felony conviction.  *See* LAWS OF 2002, ch. 289, § 2.  But as

observed by this court in *State v. Thibodeaux*, defendants do not always submit to DNA

collection despite being ordered to do so.  6 Wn. App. 2d 223, 230, 430 P.3d 700 (2018)

(citing *State v. Thornton*, 188 Wn. App. 371, 372, 353 P.3d 642 (2015)), *review denied*,

192 Wn.2d 1029, 435 P.3d 278 (2019)).

No. 35843-7-III
*State v. Ramos*

The State did not oppose the relief requested by Mr. Ramos's supplemental briefing. In view of the likelihood that Mr. Ramos *is* entitled to relief from the criminal filing and DNA collection fees, we direct the court on remand to strike those fees, subject to the State's opportunity to present evidence that they remain mandatory for Mr. Ramos.

We affirm the convictions and remand for proceedings consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Korsmo, J.

Fearing, J.