# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 52142-3-II |
| Respondent, | |
| v. | |
| BRYAN EARLE GLANT, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — Bryan Earle Glant appeals his convictions for two counts of attempted first degree rape of a child arising from an online sting operation.[1] Before trial, Glant moved to suppress his e-mail and text messages and moved to dismiss the case based on outrageous government conduct. The trial court denied both motions. The trial court found Glant guilty of both counts of attempted first degree rape of a child and sentenced Glant within the standard range.

On appeal, Glant argues that the trial court erred when it denied his motion to suppress and motion to dismiss. Glant also argues that the trial court abused its discretion when it imposed a standard range sentence.

---

[1] RCW 9A.44.073; RCW 9A.28.020.

We hold that the trial court did not err when it denied Glant's motion to suppress and motion to dismiss. Further, we hold that Glant cannot appeal his standard range sentence. Thus, we affirm.

FACTS

The Washington State Patrol Missing and Exploited Children Task Force (MECTF) investigates sex crimes against children. RCW 13.60.110. Many MECTF investigations involve the internet and are dubbed "Net Nanny" operations. Sergeant Carlos Rodriguez manages MECTF and oversees its undercover operations.

RCW 13.60.110(4) states, "The chief of the state patrol shall seek public and private grants and gifts to support the work of the task force." MECTF receives donations from private citizens and organizations. One such donor is Operation Underground Railroad (O.U.R.). O.U.R. has contributed tens of thousands of dollars to support various Net Nanny operations across the State. Following each Net Nanny operation, the Washington State Patrol issues a press release. Some of these press releases acknowledge O.U.R.'s support of the Net Nanny operation. E-mails show that Sergeant Rodriguez coordinated the financial donations from O.U.R. on behalf of MECTF. Sergeant Rodriguez collected overtime pay while conducting Net Nanny operations.

In September 2016, MECTF conducted a Net Nanny operation in Thurston County. As part of the undercover operation, MECTF posted an advertisement on the Casual Encounters section of Craigslist. "Family Play Time!?!?—w4m," the advertisement stated, "Mommy/daughter, Daddy/daughter, Daddy/son, Mommy/son. . . . you get the drift. If you know what I'm talking about hit me up we'll chat more about what I have to offer you." Clerk's Papers (CP) at 772-73.

2

Glant responded to the advertisement by e-mail. Glant then began texting with a person whom he believed was Hannah, a mother of three children. "Hannah"[2] told Glant that her son was 13 years old and her daughters were 6 and 11 years old. Glant stated he was "primarily interested in the daughters." CP at 773. Glant stated that he wanted to "use some toys with them and introduce some touching and then work towards oral." CP at 773. Hannah stated that her rules were "no pain, no anal." CP at 773. She asked Glant if he wanted to perform oral on the daughters or if he wanted the daughters to perform oral on him. Glant agreed to the rules and stated that he wanted both methods of oral. Glant asked, "What about like a finger in the bum though?" CP at 773. Hannah responded that this was acceptable if Glant brought lubricant.[3]

Glant drove from Mercer Island to Thurston County to meet Hannah and her daughters. When Glant arrived at the apartment, he had a bottle of lubricant in his pocket. Law enforcement officers arrested Glant, and the State charged him with two counts of attempted first degree rape of a child. Glant was 20 years old.

Glant made two pretrial motions. First, Glant moved to suppress his e-mails and text messages based on the Washington Privacy Act (WPA), chapter 9.73 RCW, and article I, section 7 of the Washington Constitution. The trial court found that the e-mail and text message communications between Glant and Hannah were private, that the messages were recorded on the devices used to communicate the messages, and that Glant impliedly consented to the recording because Glant knew that these messages would be preserved. The trial court also

---

[2] We use the law enforcement officer's undercover persona for clarity.

[3] Glant's and Hannah's messages occurred over three days. Hannah reinitiated contact with Glant the second day with a greeting of "hey hun . . . good afternoon . . . how are things?" CP at 454. After the pair arranged a time to meet on the second day, Hannah reinitiated contact on the third day. Over the course of their conversations, Hannah expressed interest in Glant's hobbies and complimented his looks.

found that Glant voluntarily disclosed information to the intended recipient. Consequently, the trial court ruled that law enforcement officers did not violate the WPA or article I, section 7 of the Washington Constitution, and denied Glant's motion to suppress.

Second, Glant moved to dismiss his case based on outrageous government conduct. Glant alleged financial wrongdoing in managing and funding MECTF's Net Nanny operations. Specifically, Glant argued that law enforcement officers' conduct toward Glant in the sting, along with this financial arrangement with O.U.R., amounted to outrageous government conduct which violated Glant's right to due process. Glant argued that the Net Nanny operations were improperly funded through an alliance with O.U.R. Glant argued that this arrangement violated the law because Sergeant Rodriguez solicited donations instead of the WSP chief. Glant alleged that Sergeant Rodriguez solicited donations from O.U.R. for the purpose of funding officer overtime pay that resulted from the Net Nanny operations. Glant argued that the relationship between MECTF, WSP, and O.U.R. caused MECTF to generate more arrests and push the individuals targeted by the stings into more severe crimes that MECTF then used to solicit higher O.U.R. donations.

The trial court entered detailed findings of fact and conclusions of law regarding the motion to dismiss. The trial court concluded that the motion involved two issues: (1) the alleged misconduct regarding MECTF's acquisition of funds and how that acquisition was connected to Glant's charges, and (2) the nature of the interactions between Hannah and Glant. The trial court examined these issues in the totality of the circumstances and weighed all *Lively*[4] factors. The trial court denied Glant's motion to dismiss for outrageous government conduct.

---

[4] *State v. Lively*, 130 Wn.2d 1, 921 P.2d 1035 (1996).

The case was tried to the bench based on stipulated facts. The trial court found Glant guilty of both counts of attempted first degree rape of a child.

At sentencing, Glant sought an exceptional downward sentence based on his youth. Dr. Richard Packard, a certified sex offender treatment provider, testified regarding the impact of Glant's youth on his decision-making abilities and impulsivity. The trial court considered Dr. Packard's testimony "helpful." Verbatim Report of Proceedings (VRP) (July 17, 2018) at 89. However, the trial court stated, "I am explicitly noting that I am considering the request for an exceptional sentence. I recognize that I have the discretion and judgment and authority to do that in an appropriate case. I am not finding that it is appropriate in this case." VRP (July 17, 2018) at 89-90. The trial court imposed a sentence of 108 months to life, a sentence within the standard range.

Glant appeals his convictions and his sentence.

ANALYSIS

I MOTION TO SUPPRESS

Glant argues that the trial court erred when it denied his motion to suppress his e-mail and text messages because an interception or recording authorization was required prior to intercepting Glant's messages, and that the interception of these messages violated the WPA and article I, section 7 of the Washington Constitution. We disagree.

When reviewing a suppression order, we consider whether substantial evidence supports the trial court's findings of fact and whether those findings of fact support the conclusions of law. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). Substantial evidence exists when a fair-minded person is persuaded of the truth of the stated premise. *Garvin*, 166 Wn.2d at. 249. On a motion to suppress, we review a trial court's conclusions of law de novo. *State v.*

*Baird*, 187 Wn.2d 210, 218, 386 P.3d 239 (2016). We review questions of law de novo. *State v. Kipp*, 179 Wn.2d 718, 726, 317 P.3d 1029 (2014).

A.      *Washington Privacy Act*

Glant argues that the trial court erred when it denied his motion to suppress because law enforcement officers violated his right to privacy under the WPA. Specifically, he argues that an interception or recording authorization was required before intercepting or recording his messages to Hannah. Glant also argues that he did not impliedly consent to the recording of his messages. We hold that law enforcement officers did not violate Glant's right to privacy under the WPA.

The WPA prohibits a person or agency from obtaining communications between individuals if (1) a private communication transmitted by a device was (2) recorded or intercepted by (3) a recording or transmittal device (4) without the consent of all parties. RCW 9.73.030; *State v. Townsend*, 147 Wn.2d 666, 672-73, 57 P.3d 255 (2002). Private communications include conversations transmitted through telephones, computers, and other devices that are designed to record or transmit communication. RCW 9.73.030(1)(a); *Townsend*, 147 Wn.2d at 672. A person consents when they explicitly announce their intention to engage in the communication. RCW 9.73.030(3). A person also consents by choosing to communicate through a device in which the person knows the information will be recorded. *State v. Racus*, 7 Wn. App. 2d 287, 299-300, 433 P.3d 830, *review denied*, 193 Wn.2d 1014 (2019). When a person sends e-mail or text messages they do so with the understanding that the messages would be available to the receiving party for reading or printing. *Racus*, 7 Wn. App. 2d at 299.

In *State v. Racus*, we recently held that a defendant provided implied consent regarding e-mail and text conversations because he understood that these messages would be recorded. 7

Wn. App. 2d at 299-300. Thus, law enforcement officers did not violate the WPA even though the conversations were private and obtained without authorization. 7 Wn. App. 2d at 299-300.

In *Racus*, a detective posted an advertisement on Craigslist, posing as a fictitious mother seeking individuals to engage in sexual activities with her children. 7 Wn. App. 2d at 291. The detective tracked any responses to the advertisement through Google Hangouts software. 7 Wn. App. 2d at 291. Racus responded to the advertisement and engaged in a series of e-mails and text messages with the fictitious mother, inquiring about sexual activities with her children. 7 Wn. App. 2d at 291. Although the detective did not have authorization during some of his communication with the defendant, we reasoned that authorization was not required because the defendant provided implied consent. 7 Wn. App. 2d at 299-300. The defendant chose to communicate with the detective through e-mail and text messages, understanding that the messages would be available to the receiving party for recording, and therefore, we held that the defendant impliedly consented to his communications being recorded. 7 Wn. App. 2d at 300.

Here, the trial court found that although the e-mail and text message communications between Glant and Hannah were private, Glant impliedly consented to the recording because the messages were recorded on the devices used to communicate the messages, and that Glant knew that these messages would be preserved.[5] *See Racus*, 7 Wn. App. 2d at 299. As a result, the trial court ruled that no authorization was required, and that the law enforcement officers did not violate the WPA.

---

[5] To the extent the State argues that the e-mail and text messages were not private, we note that the trial court made a finding that the communications were private. The State did not file a cross-appeal to challenge this finding. We treat unchallenged findings as verities on appeal. *State v. Kinzy*, 141 Wn.2d 373, 382, 5 P.3d 668 (2000).

Because Glant impliedly consented to the communications he had with Hannah, all parties consented to the recording. *Racus*, 7 Wn. App. 2d at 300. Specifically, Glant had to understand that computers and phones are message recording devices and that his e-mails and text messages with Hannah would be preserved. *Racus*, 7 Wn. App. 2d at 300. As a result, law enforcement officers did not violate Glant's right to privacy under the WPA when it recorded Glant's e-mail and text messages. Thus, we hold that the trial court did not err when it denied Glant's motion to suppress on WPA grounds.

Glant argues that implied consent does not apply here, or if it does, he did not impliedly consent. Glant argues that RCW 9.73.230 requires either Glant's consent, or an authorization to retain the e-mail and text message conversations.[6] Glant argues that RCW 9.73.230 applies to all "child sex cases." Br. of Appellant at 16. Specifically, Glant contends that the WPA presumes that consent by all parties is required and that "[t]he concept of 'implied consent' does not overcome this presumption." Br. of Appellant at 16. He asserts that when the legislature

_____

[6] In relevant part, RCW 9.73.230 states:

> (1) As part of a bona fide criminal investigation, the chief law enforcement officer of a law enforcement agency . . . may authorize the interception, transmission, or recording of a conversation or communication by officers under the following circumstances:
> (a) At least one party to the conversation or communication has consented to the interception, transmission, or recording;
> (b) Probable cause exists to believe that the conversation or communication involves:
> . . . .
> (ii) A party engaging in the commercial sexual abuse of a minor under RCW 9.68A.100, or promoting commercial sexual abuse of a minor under RCW 9.68A.101, or promoting travel for commercial sexual abuse of a minor under RCW 9.68A.102; and
> (c) A written report has been completed . . . .

enacted the one-party consent exception for RCW 9.73.230, the legislature intended to entirely replace the theory of implied consent.

As a general rule, the WPA prohibits recording without the consent of all parties. RCW 9.73.030. Under the one-party consent exception in RCW 9.73.230, law enforcement agencies may intercept or record conversations with authorization when a person is suspected of committing or promoting commercial sexual abuse of a minor after obtaining consent from only one party. RCW 9.73.230(1)(b)(ii). Commercial sexual abuse of a minor is defined as a person who provides or agrees to provide something of value to the minor in exchange for sexual conduct with the minor. RCW 9.68A.100(1)(a), (b).

Here, Glant argues that his actions implicated RCW 9.73.230, but RCW 9.73.230 is not applicable. RCW 9.73.230 is an exception to the general rule, allowing recording without the consent of all parties if certain requirements are met. But all parties consented here. Therefore, neither RCW 9.73.230 nor the general rule apply. Glant appears to argue that RCW 9.73.230 adds requirements to the general rule, but he is mistaken. When Glant sent messages to Hannah, there were no interceptions or transmissions, rather, the messages were recorded and the parties consented to this recording. Moreover, even if RCW 9.73.230 did apply, the record does not support that commercial sexual abuse of a minor was at issue in this case.

B.    *Article I, Section 7 of the Washington Constitution*

Glant also moved to suppress his e-mail and text messages based on his right to privacy under article I, section 7 of the Washington Constitution. On appeal, Glant argues that the recording of his e-mail and text messages was an unconstitutional warrantless search into his private affairs. We disagree.

9

Grounded in a broad right to privacy, article I, section 7 protects citizens from governmental intrusion into their private affairs without legal authority. *State v. Hinton*, 179 Wn.2d 862, 868, 319 P.3d 9 (2014). We conduct a two-step inquiry: (1) was there a governmental intrusion into one's private affairs, and (2) if so, was that intrusion authorized by law. *State v. Athan*, 160 Wn.2d 354, 366, 158 P.3d 27 (2007).

E-mails and text messages are private communications. *State v. Roden*, 179 Wn.2d 893, 900, 321 P.3d 1183 (2014). However, when a person voluntarily communicates with a stranger, that person assumes the risk that that the conversation will not be confidential. *State v. Goucher*, 124 Wn.2d 778, 786-87, 881 P.2d 210 (1994).

In *Goucher*, Goucher called the house of his drug dealer while law enforcement officers were searching the house pursuant to a warrant. 124 Wn.2d at 780-81. A detective answered, and Goucher asked if he could come over to buy drugs. 124 Wn.2d at 781. Because Goucher did not attempt to conceal his desire to buy drugs from a stranger, Goucher accepted the risk that his drug purchase would not be confidential. 124 Wn.2d at 786-87. Our Supreme Court held, "We do not see how the conversation between the Defendant and the detective constituted an unreasonable intrusion into the Defendant's private affairs and thus we find no violation of the state constitution in this case." 124 Wn.2d at 787.

Here, Glant argues that his messages were private communications that were unlawfully viewed by law enforcement officers. But, the trial court found that Glant voluntarily sent the messages to Hannah as the intended receiver.

Glant went on Craigslist and replied to a stranger's advertisement. Glant exchanged messages with a law enforcement officer, under the belief that he was communicating with Hannah, a stranger to him. Glant did not have a reasonable expectation of privacy in the

messages he sent to Hannah. Moreover, Glant assumed the risk that his conversations would not be confidential. *Goucher*, 124 Wn.2d at 786-87. We hold that the trial court did not err when it denied Glant's motion to suppress.

## II. MOTION TO DISMISS

Glant argues that the trial court erred when it denied his motion to dismiss for outrageous government conduct. We hold that the trial court did not abuse its discretion when it denied Glant's motion.

A.       *Outrageous Government Conduct Legal Principles*

The concept of outrageous conduct is founded on the principle that "the conduct of law enforcement officers . . . may be 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *State v. Lively*, 130 Wn.2d 1, 19, 921 P.2d 1035 (1996) (quoting *United States v. Russell*, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973)). We review whether the trial court erred in denying a motion to dismiss based on outrageous government misconduct for an abuse of discretion. *Athan*, 160 Wn.2d at 375-76. A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *Athan*, 160 Wn.2d at 375-76. When a trial court adopts a view that no reasonable person would take, then it has abused its discretion. *State v. Solomon*, 3 Wn. App. 2d 895, 910, 419 P.3d 436 (2018).

To determine whether government conduct violated due process, a trial court must assess the conduct based on the totality of the circumstances. *Lively*, 130 Wn.2d at 21. Government conduct is outrageous and violates due process only when the conduct is so shocking that it violates fundamental fairness and the universal sense of fairness. *Lively*, 130 Wn.2d at 19. "Public policy allows for some deceitful conduct and violation of criminal laws by the police in

11

order to detect and eliminate criminal activity." *Lively*, 130 Wn.2d at 20. Proper law enforcement objectives, preventing crime and apprehending violators, must drive law enforcement officers' conduct, not encouraging or participating in sheer lawlessness. *Lively*, 130 Wn.2d at 21. Dismissal based on outrageous government conduct is reserved for only the most egregious circumstances. *Lively*, 130 Wn.2d at 20.

In evaluating whether government conduct violated due process, courts consider several factors, including: (1) "whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity"; (2) "whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation"; (3) "whether the government controls the criminal activity or simply allows for the criminal activity to occur"; (4) "whether the police motive was to prevent crime or protect the public"; and (5) "whether the government conduct itself amounted to criminal activity or conduct 'repugnant to a sense of justice.'" *Lively*, 130 Wn.2d at 22 (citations omitted) (quoting *People v. Isaacson*, 44 N.Y.2d 511, 521, 406 N.Y.S.2d 714, 378 N.E.2d 78 (1978)).

B.      *Glant's Motion To Dismiss for Outrageous Government Conduct*

Glant moved to dismiss for outrageous government misconduct. In denying the motion, the trial court made detailed findings and conclusions. The trial court concluded that the motion was based on two issues: (1) the alleged misconduct regarding MECTF's acquisition of funds and how that acquisition was connected to Glant's charges and (2) the nature of the interactions between law enforcement and Glant. The trial court examined these issues in the totality of the circumstances and weighed all *Lively* factors. On appeal, Glant contests the trial court's conclusions and examination of each *Lively* factor.

1. *Private Involvement in Law Enforcement*

Glant cites a Kansas case, *State v. Berg*, 236 Kan. 562, 694 P.2d 427 (1985), to generally argue the trial court failed to consider the "*sui generis*, improper nature of private involvement in law enforcement." Br. of Appellant at 23. We disagree.

*State v. Berg* addressed a Kansas statute that allowed for a complaining witness to hire private counsel as associate counsel to the prosecutor to assist in the criminal proceeding. 236 Kan. at 563. Jerry Berg, a complaining witness in a case against his ex-wife, hired private counsel to assist in the prosecution. 236 Kan. at 563. But, after further investigation, the prosecutor moved to dismiss the charges. 236 Kan. at 563. Over the objections of private counsel, the trial court dismissed the case. Kan. at 563-64. The court held that private counsel could not overrule the prosecutor's decision to dismiss the charges, stating that a prosecutor must be independent. 236 Kan. at 566-68. Here, Glant argues, without elaborating, that "[t]he same must be true of police officers as well." Br. of Appellant at 23. But, *Berg* does not support Glant's argument that private funding for certain law enforcement directives are improper by their very nature. *Berg* holds that private associate counsel assisting in prosecution cannot overrule the decisions of the prosecutor. 236 Kan. at 566-68. Here, nothing in the record shows that O.U.R. was attempting to overrule or commandeer the Net Nanny operations over the objections of MECTF. We hold that the trial court did not err in this regard.

2. *Direct Link to Glant's Arrest*

Glant also argues that the trial court erred when it concluded that there was not a "direct link" between the O.U.R funding and Glant's arrest. Br. of Appellant at 24. We hold that the trial court did not err.

The trial court concluded, "There is no authority that approves the use of a dismissal under the due process clause for governmental misconduct that is not related directly to the law enforcement interactions with the defendants at issue." CP at 715. It elaborated that funding that supports law enforcement services "do[es] not create a direct enough link" to the law enforcement actions specifically related to Glant's arrest to support dismissal for outrageous government conduct. CP at 715. Here, Glant argues that, but for O.U.R's funding, the operation leading to Glant's arrest would not have occurred. But the funding of MECTF here is attenuated from Glant's arrest. O.U.R.'s funding, along with donations from individuals, generally supported the Net Nanny operations. O.U.R. did not direct MECTF to target Glant or control the details of MECTF's operation. O.U.R. merely acted as a funding source. We hold that the trial court did not err when determining that there was not a direct link between O.U.R.'s funding and Glant's arrest.

### 3. Lively *Factors*

Glant also argues that application of the *Lively* factors shows that there was outrageous government misconduct. We disagree.

Regarding the first *Lively* factor, whether police conduct instigated the crime or infiltrated ongoing activity, the trial court concluded the factor was neutral because little evidence in the record provided specific information about the "landscape of Craigslist" at the time of the sting. CP at 715. Explaining the phrase "landscape of Craigslist," the trial court stated that Craigslist might be a meeting place for consenting adults, or Craigslist might be "fraught with criminal misconduct." VRP (March 26, 2018) at 63-64. Because the record lacked sufficient evidence regarding this, the trial court found that the first factor was neutral. Here, Glant argues that there was no ongoing criminal activity and that law enforcement officers

14

instigated the crime by posting the advertisement. But, the advertisement was not aimed at Glant. Glant's response was voluntary and spontaneous. Additionally, the record does not provide information regarding the level of criminal activity on Craigslist at the time of this Net Nanny operation. We hold that the trial court did not err when it concluded that the first factor was neutral.

The trial court concluded the second factor, whether Glant's reluctance to commit a crime was overcome by pleas or solicitation, favored the State. Although the trial court recognized that Glant exhibited some reluctance in his messages, it found that the messages as a whole showed that Glant was not reluctant to commit a crime and that his will was not overcome by persistent pleas or solicitations. Here, Glant argues that he expressed reluctance during the conversations and that law enforcement reinitiated conversations, flattered Glant with compliments, and feigned interest in his personal activities. However, Glant initiated the conversation by responding to the advertisement. Glant then steered the conversation toward sexual topics regarding the daughters. Glant did not hesitate when expressing his sexual desires or agreeing to Hannah's rules. Glant drove from Mercer Island to Thurston County with lubricant to meet Hannah and the daughters. We hold that the trial court did not err when it concluded that the second factor favored the State.

The trial court concluded the third factor, whether the government controls the criminal activity or simply allows it to occur, was neutral because, like the first factor, the record lacked information. Here, Glant argues that "MECTF controlled every detail of the 'crime.'" Br. of Appellant at 26. Specifically, Glant argues that Hannah "made sure to mention a child young enough to trigger the first-degree rape of a child statute" and discussed multiple children so that Glant's crimes would be punished more severely. Br. of Appellant at 26. But Glant was told of

three children and only discussed sexual activity regarding the two daughters. Glant controlled which children he made sexually explicit comments about. We hold that the trial court did not err when it concluded that the third factor was neutral.

For the fourth factor, whether or not the police motive was to prevent crime or protect the public, the trial court concluded this factor strongly favored the State. The trial court examined RCW 13.60.110, which specifically allows for the solicitation of private funds for the MECTF, and RCW 9A.68.020, which prohibits public employees from requesting unlawful compensation. The trial court concluded that neither statute was violated for this operation. Nonetheless, the trial court stated that "even if there were technical violations of RCW 13.60.110 or RCW 9A.68.020, or another statute, the Court still finds that overall the police motive was to prevent crime and protect the public." CP at 716.

Glant argues that as a result of Net Nanny arrests, Sergeant Rodriguez personally collected over $16,000 of overtime in 2016, that most of those arrested were not criminals before answering the advertisement, and few, if any, children have been rescued from exploitation. He also argues that Sergeant Rodriguez violated RCW 13.60.110 because the delegation of funding duties was improper. Additionally, Glant argues that MECTF's relationship with O.U.R. actually prevented law enforcement officers from protecting the public. But, RCW 13.60.110 specifically allows for private funding for MECTF's goal of rooting out potential sexual abusers of children. Simply because private supporters help to fund a program does not mean that that program no longer aims to protect the public or prevent crime. We hold that the trial court did not err when it concluded that the fourth factor favored the State.

The trial court concluded the fifth factor, whether the government conduct itself amounted to criminal activity or conduct that is repugnant to a sense of justice, favored the State.

16

The trial court concluded that no law enforcement officer violated the law or acted in a way that was repugnant to justice. The trial court concluded, "Even if there were [sic] criminal activity in this case, it is not sufficient to justify a dismissal given the standards that apply." CP at 717. Here, Glant argues that police conduct amounted to criminal activity because it "offered up fictitious children for sexual assault," violated the WPA, and violated RCW 13.60.110. Br. of Appellant at 28. However, to the extent law enforcement officers violated the law with the specific facts of the undercover operation, it was to protect the public and prevent crime against actual children. Additionally, RCW 13.60.110 is not a criminal statute and law enforcement officers did not violate the WPA. We hold that the trial court did not err when it concluded that the fifth factor favored the State.

The trial court concluded that regardless of any violation of the law or criminal activity by police officers, Glant's motion to dismiss was denied because he did not show that law enforcement officers participated in outrageous conduct. The trial court did not adopt a view that no reasonable judge would take. The record does not show whether law enforcement's operation instigated a crime or infiltrated ongoing criminal activity. Glant was not reluctant to commit a crime and his will was not overcome by persistent pleas or solicitations. Government's motive was to protect the public and prevent crime, and law enforcement officers did not act in a manner repugnant to a sense of justice. Because a reasonable judge could have adopted the view of the trial court, we hold that the trial court did not abuse its discretion when denying Glant's motion to dismiss.

### III. SENTENCING

Glant argues that "the trial court abused its discretion by rejecting the testimony of Dr. Packard" regarding Glant's impulsivity and immaturity. Br. of Appellant at 47. Glant argues

17

that the trial court abused its discretion when it concluded that the span of time regarding Glant's actions "broke the chain" of Glant's impulsivity. Br. of Appellant at 47. We hold that Glant cannot appeal his standard range sentence.

Although no defendant is entitled to an exceptional downward sentence, every defendant is entitled to ask the sentencing court to consider such a sentence and to have it actually considered. *State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005). The SRA provides a defendant an opportunity to raise his youth for the purpose of requesting an exceptional sentence downward. *In re Pers. Restraint of Light-Roth*, 191 Wn.2d 328, 336, 422 P.3d 444 (2018). Additionally, the SRA provides the trial court with the ability to exercise its discretion in considering youth as a mitigating factor. *Pers. Restraint of Light-Roth*, 191 Wn.2d at 336. However, "age is not a per se mitigating factor" that automatically entitles young defendants to an exceptional sentence downward. *State v. O'Dell*, 183 Wn.2d 680, 695, 358 P.3d 359 (2015) (plurality opinion).

In general, a party cannot appeal a sentence within the standard range. *State v. Brown*, 145 Wn. App. 62, 77, 184 P.3d 1284 (2008); RCW 9.94A.585(1).[7] The rationale is that a trial court that imposes a sentence within the range set by the legislature cannot abuse its discretion as to the length of the sentence as a matter of law. *Brown*, 145 Wn. App. at 78. However, a defendant may appeal a standard range sentence when a trial court has refused to exercise its discretion or relies on an impermissible basis for its refusal to impose an exceptional sentence downward. *State v. McFarland*, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017) (plurality opinion). It

---

[7] RCW 9.94A.585 (1) provides, "A sentence within the standard sentence range, under RCW 9.94A.510 or 9.94A.517, for an offense shall not be appealed."

is error for a trial court to categorically refuse to impose an exceptional sentence downward or to mistakenly believe that it does not have such discretion. *McFarland*, 189 Wn.2d at 56.

Here, RCW 9.94A.585(1) prevents Glant from appealing his standard range sentence. The trial court stated, "I am explicitly noting that I am considering the request for an exceptional sentence. I recognize that I have the discretion and judgment and authority to do that in an appropriate case. I am not finding that it is appropriate in this case." VRP (July 17, 2018) at 89-90. The trial court stated that Dr. Packard's testimony was "helpful" and considered Glant's youthfulness before imposing the standard range sentence. VRP (July 17, 2018) at 89-91. The trial court did not refuse to exercise its discretion or mistakenly believe it lacked discretion to deviate from the standard range. Thus, we hold that Glant cannot appeal his standard range sentence.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, J.

We concur:

_____
Lee, C.J.

_____
Melnick, J.